581 A.2d 162

**Catherine E. Walsh SIMEONE, Appellant,**

v.

**Frederick A. SIMEONE, Appellee.**

Supreme Court of Pennsylvania.

Argued Jan. 23, 1990.
Decided Sept. 25, 1990.

Leonard Dubin, George J. Krueger, Philadelphia, for appellant.

Albert Momjian, Philadelphia, Stewart B. Barmen, Pittsburgh, Jerold S. Berschler, Norristown, for: amicus—The American Academy of Matrimonial Lawyers, Pa. Chapter.

Robert I. Whitelaw, Philadelphia, for appellee.

396

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

FLAHERTY *, Justice.

At issue in this appeal is the validity of a prenuptial agreement executed between the appellant, Catherine E. Walsh Simeone, and the appellee, Frederick A. Simeone. At the time of their marriage, in 1975, appellant was a twenty-three year old nurse and appellee was a thirty-nine year old neurosurgeon. Appellee had an income of approximately $90,000 per year, and appellant was unemployed. Appellee also had assets worth approximately $300,000. On the eve of the parties' wedding, appellee's attorney presented appellant with a prenuptial agreement to be signed. Appellant, without the benefit of counsel, signed the agreement. Appellee's attorney had not advised appellant regarding any legal rights that the agreement surrendered. The parties are in disagreement as to whether appellant knew in advance of that date that such an agreement would be presented for signature. Appellant denies having had such knowledge and claims to have signed under adverse circumstances, which, she contends, provide a basis for declaring it void.

The agreement limited appellant to support payments of $200 per week in the event of separation or divorce, subject to a maximum total payment of $25,000. The parties separated in 1982, and, in 1984, divorce proceedings were commenced. Between 1982 and 1984 appellee made payments which satisfied the $25,000 limit. In 1985, appellant filed a claim for alimony *pendente lite.* A master's report upheld the validity of the prenuptial agreement and denied this claim. Exceptions to the master's report were dismissed by the Court of Common Pleas of Philadelphia County. The

---

* This case was reassigned to this writer.

Superior Court affirmed. *Simeone v. Simeone*, 380 Pa.Super. 37, 551 A.2d 219 (1988).

We granted allowance of appeal because uncertainty was expressed by the Superior Court regarding the meaning of our plurality decision in *Estate of Geyer*, 516 Pa. 492, 533 A.2d 423 (1987) (Opinion Announcing Judgment of the Court). The Superior Court viewed *Geyer* as permitting a prenuptial agreement to be upheld if it *either* made a reasonable provision for the spouse *or* was entered after a full and fair disclosure of the general financial positions of the parties and the statutory rights being relinquished. Appellant contends that this interpretation of *Geyer* is in error insofar as it requires disclosure of statutory rights *only* in cases where there has not been made a reasonable provision for the spouse. Inasmuch as the courts below held that the provision made for appellant was a reasonable one, appellant's efforts to overturn the agreement have focused upon an assertion that there was an inadequate disclosure of statutory rights. Appellant continues to assert, however, that the payments provided in the agreement were less than reasonable.

The statutory rights in question are those relating to alimony *pendente lite*. Other statutory rights, such as those pertaining to alimony and equitable distribution of marital property, did not exist in 1975. Those rights arose under the Divorce Code of 1980, and the Code expressly provides that marital agreements executed prior to its effective date are not affected thereby. 23 P.S. § 103. Certainly, at the time the present agreement was executed, no disclosure was required with respect to rights which were not then in existence. The present agreement did expressly state, however, that alimony *pendente lite* was being relinquished. It also recited that appellant "has been informed and understands" that, were it not for the agreement, appellant's obligation to pay alimony *pendente lite* "might, as a matter of law, exceed the amount provided." Hence, appellant's claim is not that the agreement failed to disclose the particular right affected, but rather that she was not

adequately informed with respect to the nature of alimony *pendente lite.*

The plurality opinion in *Geyer* expressly applied and followed this Court's decision in *Hillegass Estate*, 431 Pa. 144, 244 A.2d 672 (1968), which held that a prenuptial agreement will be upheld if it *either* made a reasonable provision for the spouse *or* was entered after a full and fair disclosure of financial status. See *Geyer*, 516 Pa. at 502 n. 9, 533 A.2d at 427 n. 9. The concluding paragraph of the *Geyer* plurality opinion, however, injected a basis for uncertainty as to whether *Hillegass* was being strictly followed. It stated as follows:

[A]ny agreement which seeks to change the duly enacted public policy of this Commonwealth must be based on nothing less than full and fair disclosure. Such disclosure must include both the general financial pictures of the parties involved, and evidence that the parties are aware of the statutory rights which they are relinquishing.

516 Pa. at 506, 533 A.2d at 429–30 (emphasis added) (footnotes omitted).

The Superior Court attempted to reconcile this language with the earlier portion of *Geyer* which applied *Hillegass* and concluded that, viewed in context, this language meant that full and fair disclosure of financial positions and statutory rights was required *only* where the provisions made for a spouse were unreasonable. Because the Superior Court viewed the present agreement as having made an adequate provision for appellant, it held that the agreement was valid regardless of whether there had been a full disclosure of statutory rights being surrendered. The alternative, of course, would have been to require full and fair disclosure in *every* case, but such would plainly have been inconsistent with *Hillegass*, supra.

■ While the decision of the Superior Court reflects, perhaps, a reasonable interpretation of *Geyer*, we do not view this case as a vehicle to affirm that interpretation.

Rather, there is need for a reexamination of the foundations upon which *Geyer* and earlier decisions rested, and a need for clarification of the standards by which the validity of prenuptial agreements will be judged.

There is no longer validity in the implicit presumption that supplied the basis for *Geyer* and similar earlier decisions. Such decisions rested upon a belief that spouses are of unequal status and that women are not knowledgeable enough to understand the nature of contracts that they enter. Society has advanced, however, to the point where women are no longer regarded as the "weaker" party in marriage, or in society generally. Indeed, the stereotype that women serve as homemakers while men work as breadwinners is no longer viable. Quite often today both spouses are income earners. Nor is there viability in the presumption that women are uninformed, uneducated, and readily subjected to unfair advantage in marital agreements. Indeed, women nowadays quite often have substantial education, financial awareness, income, and assets.

Accordingly, the law has advanced to recognize the equal status of men and women in our society. See, e.g., Pa. Const. art. 1, § 28 (constitutional prohibition of sex discrimination in laws of the Commonwealth). Paternalistic presumptions and protections that arose to shelter women from the inferiorities and incapacities which they were perceived as having in earlier times have, appropriately, been discarded. See *Geyer*, 516 Pa. at 509–14, 533 A.2d at 431–33 (dissenting opinion of Mr. Chief Justice Nix setting forth detailed history of case law evidencing a shift away from the former paternalistic approach of protecting women towards a newer approach of equal treatment). It would be inconsistent, therefore, to perpetuate the standards governing prenuptial agreements that were described in *Geyer* and similar decisions, as these reflected a paternalistic approach that is now insupportable.

■ Further, *Geyer* and its predecessors embodied substantial departures from traditional rules of contract law, to the extent that they allowed consideration of the knowledge

of the contracting parties and reasonableness of their bargain as factors governing whether to uphold an agreement. Traditional principles of contract law provide perfectly adequate remedies where contracts are procured through fraud, misrepresentation, or duress. Consideration of other factors, such as the knowledge of the parties and the reasonableness of their bargain, is inappropriate. See *Geyer*, 516 Pa. at 516–17, 533 A.2d at 434–35 (Flaherty, J. dissenting). Prenuptial agreements are contracts, and, as such, should be evaluated under the same criteria as are applicable to other types of contracts. See *Geyer*, 516 Pa. at 508, 533 A.2d at 431 ("These agreements are nothing more than contracts and should be treated as such." (Nix, C.J. dissenting)). Absent fraud, misrepresentation, or duress, spouses should be bound by the terms of their agreements.

▇ Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains. See *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983) (failure to read a contract does not warrant avoidance or nullification of its provisions); *Estate of Brant*, 463 Pa. 230, 235, 344 A.2d 806, 809 (1975); *Bollinger v. Central Pennsylvania Quarry Stripping & Construction Co.*, 425 Pa. 430, 432, 229 A.2d 741, 742 (1967) ("Once a person enters into a written agreement he builds around himself a stone wall, from which he cannot escape by merely asserting he had not understood what he was signing."); *Montgomery v. Levy*, 406 Pa. 547, 550, 177 A.2d 448, 450 (1962) (one is legally bound to know the terms of the contract entered). Based upon these principles, the terms of the present prenuptial agreement must be regarded as binding, without regard to whether the terms were fully understood by appellant. *Ignorantia non excusat.*

▇ Accordingly, we find no merit in a contention raised by appellant that the agreement should be declared

void on the ground that she did not consult with independent legal counsel. To impose a *per se* requirement that parties entering a prenuptial agreement must obtain independent legal counsel would be contrary to traditional principles of contract law, and would constitute a paternalistic and unwarranted interference with the parties' freedom to enter contracts.

Further, the reasonableness of a prenuptial bargain is not a proper subject for judicial review. *Geyer* and earlier decisions required that, at least where there had been an inadequate disclosure made by the parties, the bargain must have been reasonable at its inception. See *Geyer*, 516 Pa. at 503, 533 A.2d at 428. Some have even suggested that prenuptial agreements should be examined with regard to whether their terms remain reasonable at the time of dissolution of the parties' marriage.

By invoking inquiries into reasonableness, however, the functioning and reliability of prenuptial agreements is severely undermined. Parties would not have entered such agreements, and, indeed, might not have entered their marriages, if they did not expect their agreements to be strictly enforced. If parties viewed an agreement as reasonable at the time of its inception, as evidenced by their having signed the agreement, they should be foreclosed from later trying to evade its terms by asserting that it was not in fact reasonable. Pertinently, the present agreement contained a clause reciting that "each of the parties considers this agreement fair, just and reasonable...."

Further, everyone who enters a long-term agreement knows that circumstances can change during its term, so that what initially appeared desirable might prove to be an unfavorable bargain. Such are the risks that contracting parties routinely assume. Certainly, the possibilities of illness, birth of children, reliance upon a spouse, career change, financial gain or loss, and numerous other events that can occur in the course of a marriage cannot be regarded as unforeseeable. If parties choose not to address

such matters in their prenuptial agreements, they must be regarded as having contracted to bear the risk of events that alter the value of their bargains.

We are reluctant to interfere with the power of persons contemplating marriage to agree upon, and to act in reliance upon, what *they* regard as an acceptable distribution scheme for their property. A court should not ignore the parties' expressed intent by proceeding to determine whether a prenuptial agreement was, in the court's view, reasonable at the time of its inception or the time of divorce. These are exactly the sorts of judicial determinations that such agreements are designed to avoid. Rare indeed is the agreement that is beyond possible challenge when reasonableness is placed at issue. Parties can routinely assert some lack of fairness relating to the inception of the agreement, thereby placing the validity of the agreement at risk. And if reasonableness at the time of divorce were to be taken into account an additional problem would arise. Virtually nonexistent is the marriage in which there has been absolutely no change in the circumstances of either spouse during the course of the marriage. Every change in circumstance, foreseeable or not, and substantial or not, might be asserted as a basis for finding that an agreement is no longer reasonable.

In discarding the approach of *Geyer* that permitted examination of the reasonableness of prenuptial agreements and allowed inquiries into whether parties had attained informed understandings of the rights they were surrendering, we do not depart from the longstanding principle that a full and fair disclosure of the financial positions of the parties is required. Absent this disclosure, a material misrepresentation in the inducement for entering a prenuptial agreement may be asserted. *Hillegass,* 431 Pa. at 152–53, 244 A.2d at 676–77. Parties to these agreements do not quite deal at arm's length, but rather at the time the contract is entered into stand in a relation of mutual confidence and trust that calls for disclosure of their financial resources. *Id.,* 431 Pa. at 149, 244 A.2d at 675; *Gelb*

*Estate,* 425 Pa. 117, 120, 228 A.2d 367, 369 (1967). It is well settled that this disclosure need not be exact, so long as it is "full and fair." *Kaufmann Estate,* 404 Pa. 131, 136 n. 8, 171 A.2d 48, 51 n. 8 (1961). In essence therefore, the duty of disclosure under these circumstances is consistent with traditional principles of contract law.

■■■ If an agreement provides that full disclosure has been made, a presumption of full disclosure arises. If a spouse attempts to rebut this presumption through an assertion of fraud or misrepresentation then this presumption can be rebutted if it is proven by clear and convincing evidence. *Hillegass,* 431 Pa. at 152–53, 244 A.2d at 676–77.

The present agreement recited that full disclosure had been made, and included a list of appellee's assets totalling approximately $300,000. Appellant contends that this list understated by roughly $183,000 the value of a classic car collection which appellee had included at a value of $200,-000. The master, reviewing the parties' conflicting testimony regarding the value of the car collection, found that appellant failed to prove by clear and convincing evidence that the value of the collection had been understated. The courts below affirmed that finding. We have examined the record and find ample basis for concluding that the value of the car collection was fully disclosed. Appellee offered expert witnesses who testified to a value of approximately $200,000. Further, appellee's disclosure included numerous cars that appellee did not even own but which he merely hoped to inherit from his mother at some time in the future. Appellant's contention is plainly without merit.

■■■ Appellant's final contention is that the agreement was executed under conditions of duress in that it was presented to her at 5 p.m. on the eve of her wedding, a time when she could not seek counsel without the trauma, expense, and embarrassment of postponing the wedding. The master found this claim not credible. The courts below affirmed that finding, upon an ample evidentiary basis.

Although appellant testified that she did not discover until the eve of her wedding that there was going to be a prenuptial agreement, testimony from a number of other witnesses was to the contrary. Appellee testified that, although the final version of the agreement was indeed presented to appellant on the eve of the wedding, he had engaged in several discussions with appellant regarding the contents of the agreement during the six month period preceding that date. Another witness testified that appellant mentioned, approximately two or three weeks before the wedding, that she was going to enter a prenuptial agreement. Yet another witness confirmed that, during the months preceding the wedding, appellant participated in several discussions of prenuptial agreements. And the legal counsel who prepared the agreement for appellee testified that, prior to the eve of the wedding, changes were made in the agreement to increase the sums payable to appellant in the event of separation or divorce. He also stated that he was present when the agreement was signed and that appellant expressed absolutely no reluctance about signing. It should be noted, too, that during the months when the agreement was being discussed appellant had more than sufficient time to consult with independent legal counsel if she had so desired. See generally *Carrier v. William Penn Broadcasting Corp.*, 426 Pa. 427, 431, 233 A.2d 519, 521 (1967) (concept of duress as applied to contracting parties). Under these circumstances, there was plainly no error in finding that appellant failed to prove duress.

Hence, the courts below properly held that the present agreement is valid and enforceable. Appellant is barred, therefore, from receiving alimony *pendente lite.*

Order affirmed.

PAPADAKOS, J., files a concurring opinion.

McDERMOTT files a dissenting opinion which is joined by LARSEN, J.

PAPADAKOS, Justice, concurring.

Although I continue to adhere to the principles enunciated in *Estate of Geyer*, 516 Pa. 492, 533 A.2d 423 (1987), I concur in the result because the facts fully support the existence of a valid and enforceable agreement between the parties and any suggestion of duress is totally negated by the facts. The full and fair disclosure, as well as the lack of unfairness and inequity, standards reiterated in *Geyer* are supported by the facts in this case so that I can concur in the result.

However, I cannot join the opinion authored by Mr. Justice Flaherty, because, it must be clear to all readers, it contains a number of unnecessary and unwarranted declarations regarding the "equality" of women. Mr. Justice Flaherty believes that, with the hard-fought victory of the Equal Rights Amendment in Pennsylvania, all vestiges of inequality between the sexes have been erased and women are now treated equally under the law. I fear my colleague does not live in the real world. If I did not know him better I would think that his statements smack of male chauvinism, an attitude that "you women asked for it, now live with it." If you want to know about equality of women, just ask them about comparable wages for comparable work. Just ask them about sexual harassment in the workplace. Just ask them about the sexual discrimination in the Executive Suites of big business. And the list of discrimination based on sex goes on and on.

I view prenuptial agreements as being in the nature of contracts of adhesion with one party generally having greater authority than the other who deals in a subservient role. I believe the law protects the subservient party, regardless of that party's sex, to insure equal protection and treatment under the law.

The present case does not involve the broader issues to which the gratuitous declarations in question are addressed, and it is injudicious to offer declarations in a case which does not involve those issues. Especially when those declarations are inconsistent with reality.

McDERMOTT, Justice, dissenting.

I dissent. I would reverse and remand to the trial court for further consideration of the validity of the prenuptial agreement executed by the appellee, Dr. Frederick Simeone, and Catherine Simeone, on the eve of their wedding.

Let me begin by setting forth a common ground between my position in this matter and that of the majority. There can be no question that, in the law and in society, men and women must be accorded equal status. I am in full agreement with the majority's observation that "women nowadays quite often have substantial education, financial awareness, income, and assets." Majority Slip Op. at 6. However, the plurality decision I authored in *Estate of Geyer*, 516 Pa. 492, 533 A.2d 423 (1987), as well as the Dissenting Opinion I offer today, have little to do with the equality of the sexes, but everything to do with the solemnity of the matrimonial union. I am not willing to believe that our society views marriage as a mere contract for hire. On the contrary, our Legislature has set forth the public policy which must guide this Court: "The family is the basic unit of society and the protection of the family is of paramount public concern." *See* 23 P.S. § 102. In this Commonwealth, we have long declared our interest in the stability of marriage and in the stability of the family unit. Our courts must seek to protect, and not to undermine, those institutions and interests which are vital to our society.

The subject of the validity of pre-nuptial agreements is not a new issue for this Court. A pre-nuptial agreement is the reservation of ownership over land, money and any other property, acquired in the past, present or future, from the most unique of human bargains. A pre-nuptial agreement may also prove an intention to get the best out of a marriage without incurring any obligation to do more than be there so long as it suits a purpose. Certainly, a pre-nuptial agreement may serve many purposes consistent with love and affection in life. It may answer obligations incurred prior to present intentions, obligations to children, parents, relatives, friends and those not yet born. It may

answer obligations owed for prior help and affection. It may serve to keep matters right and fair, for innumerable reasons arising antecedent to the marriage. Indeed, it may prove a fidelity in persons to prior obligations that makes their intended promises the more secure. Moreover, society has an interest in protecting the right of its citizens to contract, and in seeing the reduction, in the event of a dissolution of the marriage, of the necessity of lengthy, complicated, and costly litigation. Thus, while I acknowledge the longstanding rule of law that pre-nuptial agreements are presumptively valid and binding upon the parties, I am unwilling to go as far as the majority to protect the right to contract at the expense of the institution of marriage. Were a contract of marriage, the most intimate relationship between two people, not the surrender of freedom, an offering of self in love, sacrifice, hope for better or for worse, the begetting of children and the offer of effort, labor, precious time and care for the safety and prosperity of their union, then the majority would find me among them.

In my view, one seeking to avoid the operation of an executed pre-nuptial agreement must first establish, by clear and convincing evidence, that a full and fair disclosure of the worth of the intended spouse was not made at the time of the execution of the agreement. This Court has recognized that full and fair disclosure is needed because, at the time of the execution of a pre-nuptial agreement, the parties do not stand in the usual arm's length posture attendant to most other types of contractual undertakings, but "stand in a relation of mutual confidence and trust that calls for the highest degree of good faith...." *See Gelb Estate*, 425 Pa. 117, 123, 228 A.2d 367, 369 (1967). *See also In Re Estate of Kester*, 486 Pa. 349, 405 A.2d 1244 (1979). In addition to a full and fair disclosure of the general financial pictures of the parties, I would find a pre-nuptial agreement voidable where it is established that the parties were not aware, at the time of contracting, of existing statutory rights which they were relinquishing upon the

signing of the agreement. *Estate of Geyer, supra.* It is here, with a finding of full and fair disclosure, that the majority would end its analysis of the validity of a pre-nuptial agreement. I would not. An analysis of the fairness and equity of a pre-nuptial agreement has long been an important part of the law of this state. *Hillegass Estate,* 431 Pa. 144, 244 A.2d 672 (1968). I am not willing to depart from this history, which would continue to serve our public policy.

At the time of dissolution of the marriage, a spouse should be able to avoid the operation of a pre-nuptial agreement upon clear and convincing proof that, despite the existence of full and fair disclosure at the time of the execution of the agreement, the agreement is nevertheless so inequitable and unfair that it should not be enforced in a court of this state. Although the spouse attempting to avoid the operation of the agreement will admittedly have a difficult burden given the standard of proof, and the fact of full and fair disclosure, we must not close our courts to relief where to enforce an agreement will result in unfairness and inequity. The majority holds to the view, without waiver, that parties, having contracted with full and fair disclosure, should be made to suffer the consequences of their bargains. In so holding, the majority has given no weight to the other side of the scales: the state's paramount interest in the preservation of marriage and the family relationship, and the protection of parties to a marriage who may be rendered wards of the state, unable to provide for their own reasonable needs. Our sister states have found such treatment too short a shrift for so fundamental a unit of society.[1]

Thus, I believe that the door should remain open for a spouse to avoid the application of a pre-nuptial agreement where clear and convincing proof establishes that the result

---

1. *See Marschall v. Marschall,* 195 N.J.Super. 16, 477 A.2d 833 (1984); *Newman v. Newman,* 653 P.2d 728 (Col.Sup.Ct.1982); *Osborne v. Osborne,* 384 Mass. 591, 428 N.E.2d 810 (1981); *Scherer v. Scherer,* 249 Ga. 635, 292 S.E.2d 662 (1982); *Gooch v. Gooch,* 10 Ark.App. 432, 664 S.W.2d 900 (1984).

will be inequity and unfairness under the circumstances of the particular case and the public policy of this state. Some pre-nuptial agreements will be unfair and inequitable from their beginning. In *Hillegass Estate, supra.,* we recognized that reasonableness at the inception of the agreement necessarily depends upon the totality of all the facts and circumstances existing at the time of the execution of the agreement, including: (a) the financial situation of each spouse; (b) the age of the parties; (c) the number of children each has; (d) the intelligence of the parties; (e) the standard of living each spouse had before marriage and could reasonably expect to have during marriage. *Id.,* 431 Pa. at 150, 244 A.2d at 676. The plurality in *Estate of Geyer, supra.,* determined that the pre-nuptial agreement at issue there was so inequitable at its inception as to render it unenforceable against the wife upon her husband's death, given the fact that the wife, according to the agreement, was to receive, in essence, only the marital home which she could not possibly afford to keep or to maintain. "Appellant's plight was predictable, especially to decedent who, at the time of the antenuptial agreement, was aware of the costs of running his home. Nevertheless, no provision for the home's maintenance costs were included within the agreement. The net result of this was that the conveyance of the house to appellant was doomed to fail from the beginning.... We can hardly say such a one-sided bargain represents reasonable provision under the *Hillegass* standard." *Id.* 516 Pa. at 504–505, 533 A.2d at 429.

I would emphasize that there are circumstances at the inception of marriage that render a pre-nuptial agreement not only fair and equitable, but a knowing and acceptable reservation of ownership. Such are usually the circumstances surrounding a second marriage. One coming to a second marriage may reserve property created in a previous union, to satisfy what they think a proper and just disposition of that property should be, for children of that prior marriage, or other relations or obligations they feel it a duty to observe. Likewise, one of wealth or property

entering a marriage need stake no more on its success than what is fair and reasonable independent of the value of their wealth. That is to say that one's previous wealth is not in itself a criterion of fairness. One is not required to give all they brought for an agreement to be reasonable. So too may one properly reserve things given them as heirlooms, or things of peculiar meaning expressly stated, so long as their value is not increased or preserved as a result of efforts or sacrifice by the union.

It is also apparent that, although a pre-nuptial agreement is quite valid when drafted, the passage of time accompanied by the intervening events of a marriage, may render the terms of the agreement completely unfair and inequitable. While parties to a pre-nuptial agreement may indeed foresee, generally, the events which may come to pass during their marriage, one spouse should not be made to suffer for failing to foresee all of the surrounding circumstances which may attend the dissolution of the marriage. Although it should not be the role of the courts to void pre-nuptial agreements merely because one spouse may receive a better result in an action under the Divorce Code to recover alimony or equitable distribution, it should be the role of the courts to guard against the enforcement of pre-nuptial agreements where such enforcement will bring about only inequity and hardship. It borders on cruelty to accept that after years of living together, yielding their separate opportunities in life to each other, that two individuals emerge the same as the day they began their marriage.

At the time of the dissolution of marriage, what are the circumstances which would serve to invalidate a pre-nuptial agreement? This is a question that should only be answered on a case-by-case basis. However, it is not unrealistic to imagine that in a given situation, one spouse, although trained in the workforce at the time of marriage, may, over many years, have become economically dependent upon the other spouse. In reliance upon the permanence of marriage and in order to provide a stable home for a family, a spouse

may choose, even at the suggestion of the other spouse, not to work during the marriage. As a result, at the point of dissolution of the marriage, the spouse's employability has diminished to such an extent that to enforce the support provisions of the pre-nuptial agreement will cause the spouse to become a public charge, or will provide a standard of living far below that which was enjoyed before and during marriage. In such a situation, a court may properly decide to render void all or some of the provisions of the pre-nuptial agreement.

I can likewise conceive of a situation where, after a long marriage, the value of property may have increased through the direct efforts of the spouse who agreed not to claim it upon divorce or death. In such a situation, the court should be able to decide whether it is against the public policy of the state, and thus inequitable and unfair, for a spouse to be precluded from receiving that increase in the value of property which he or she had, at least in part, directly induced. I marvel at the majority's apparent willingness to enforce a pre-nuptial agreement in the interest of freedom to contract at any cost, even where unforeseen and untoward illness has rendered one spouse unable, despite his own best efforts, to provide reasonable support for himself. I would further recognize that a spouse should be given the opportunity to prove, through clear and convincing evidence, that the amount of time and energy necessary for that spouse to shelter and care for the children of the marriage has rendered the terms of a pre-nuptial agreement inequitable, and unjust and thus, avoidable.

The majority is concerned that parties will routinely challenge the validity of their pre-nuptial agreements. Given the paramount importance of marriage and family in our society, and the serious consequences that may accompany the dissolution of a marriage, we should not choose to close the doors of our courts merely to gain a measure of judicial economy. Further, although I would continue to allow parties to challenge the validity of pre-nuptial agreements, I

would not alter the burden of proof which has been required to sustain such a challenge.

Turning to the facts of the present case, the Master and the trial court agreed that full and fair disclosure had been made as to the value of Dr. Simeone's antique cars. Thus, I agree with the majority that the appellant, Catherine Simeone, cannot seek to avoid the operation of the pre-nuptial agreement on the grounds that full and fair disclosure of financial status was lacking at the time the agreement was executed. However, at issue in the present appeal is the provision of the pre-nuptial agreement which bars appellant's claim for alimony *pendente lite*. In 1975, the following statutory provision was applicable:

> In the case of divorce from the bonds of matrimony or bed and board, the court may, upon petition, in proper cases, allow a spouse reasonable alimony pendente lite and reasonable counsel fees and expenses.

The Divorce Law, Act of May 2, 1929, P.L. 1237, § 46, as amended, June 27, 1974, P.L. 403, No. 139, § 1; 23 P.S. § 46. This statute was repealed in 1980 with the enactment of the new Divorce Code:

> The court may, upon petition, in proper cases, allow a spouse reasonable alimony pendente lite, spousal support and reasonable counsel fees and expenses....

23 P.S. § 502.

I would remand this matter to provide the appellant with an opportunity to challenge the validity of the pre-nuptial agreement on two grounds. Although alimony *pendente lite* was mentioned in the pre-nuptial agreement [2], appellant should have an opportunity to establish that the mere recitation of this legal term did not advise her of the general nature of the statutory right she was relinquishing

---

**2.** The agreement stated in relevant part: "Frederick's obligation to make payments to Catherine for her support and maintenance or as alimony (including, without limitation, alimony *pendente lite* ) shall be limited to and shall not exceed the $200 per week as above provided, and Catherine does hereby acknowledge that the foregoing provision for the payment of $200 per week is fair, just and reasonable."

with the signing of the agreement.[3] Appellant must establish this lack of full and fair disclosure of her statutory rights with clear and convincing evidence. Further, I would allow appellant the opportunity, with the same standard of proof, to challenge the validity of the pre-nuptial agreement's support provisions, relating to alimony *pendente lite* and alimony, for undue unfairness and inequity. I would express no opinion, however, on the appropriate final resolution of these issues. An appellate court should defer to the trial court in these determinations, and the trial court order should not be reversed absent an error of law or an abuse of discretion.

LARSEN, J., joins this dissenting opinion.

---

**3.** This would not apply to any claim for alimony, as the statutory right to alimony did not arise until the enactment of the Divorce Code of 1980.