592 A.2d 64

**Gloria KARKARIA**

v.

**Navroz J. KARKARIA, Appellant.**

Superior Court of Pennsylvania.

Argued March 15, 1990.

Filed May 31, 1991.

Lea E. Anderson, Pittsburgh, for appellant.

Denise W. Ford, Pittsburgh, for appellee.

Patricia G. Miller, Pittsburgh, amicus curiae.

Before CIRILLO, President Judge, and FORD ELLIOTT and BROSKY, JJ.

CIRILLO, President Judge:

This appeal calls upon us to decide an issue not yet explicitly addressed by the appellate courts of this Commonwealth: whether an antenuptial agreement entered into after enactment of the Divorce Code, 23 P.S. §§ 101–801, may properly limit or waive the economic rights which the

parties would otherwise possess under the Code's provisions and, if so, what standards govern the enforceability of such an agreement. Upon careful study of the arguments advanced by the parties, amicus curiae and the trial court, we conclude that the trial court erred by departing from the principles which have traditionally been applied by the courts of this Commonwealth in assessing marital agreements and by substituting alternative standards adopted from the law of other jurisdictions.

The parties to this action are Navroz J. Karkaria ("husband"), and Gloria Karkaria ("wife"). They married on August 22, 1981, and separated on December 1, 1986. The marriage was husband's second and wife's third. No children were born of the union, but both parties had minor children from their prior marriages, three of whom resided with them during this marriage. Both parties were in their forties at the time of their marriage and had a history of financial independence through employment, husband having worked as a civil engineer for Consolidation Coal Company since 1966, and wife having worked for twenty years as a nurse and for several years as a police officer. At the time of the marriage, however, wife was unemployed and receiving disability payments due to a back injury suffered in her employment as a police officer. The parties had begun living together in husband's residence in May, 1981, and wife asserts that during this period of cohabitation, husband helped her meet her living expenses, but periodically presented her with bills for repayment, with interest, of the money he had advanced her. This pattern continued throughout the marriage, with wife paying half of all household expenses.

For several months prior to the marriage, the parties discussed the possibility of entering into a prenuptial agreement regarding their rights in the event of divorce, and in February, 1981, husband provided wife with a preliminary draft of the terms he wished included in such an agreement. At the same time, he delivered the draft to his lawyer, requesting that a legally binding agreement be prepared.

Wife immediately consulted an attorney, who advised her that she should return to legal counsel for assistance if the draft were reduced to a formal agreement. The proposed agreement was completed by husband's attorney in mid-August, 1981, at which time the attorney met with both parties, attempted to explain the agreement's provisions to wife and advised her that she should have the document reviewed by independent counsel before signing it. In addition, wife spoke about the agreement with an attorney representing her in connection with her disability claim; this attorney advised her that the agreement should not be signed without a full review by counsel, but that he would be unable to conduct such a review without more time. On August 19, 1981, when wife found that her chosen attorney would not be able to meet with her to review the agreement before the parties' scheduled wedding day of August 22, she signed the agreement without counsel because she believed that husband would not go through with the marriage unless she did so. In essence, the agreement provided that the parties' marriage was to have no economic consequences: the parties were to remain financially separate during their marriage and any statutory rights which either party might otherwise have claimed in the event of death or divorce were waived.[1]

This action was initiated in November of 1986, when wife filed a complaint in divorce alleging that the marriage was irretrievably broken and requesting equitable distribution, alimony pendente lite, alimony, counsel fees, and expenses. Husband filed a timely answer and new matter in which he agreed that the marriage should be dissolved, but maintained that wife's economic claims were barred by the antenuptial agreement. Thereafter, wife filed a reply in

---

1. Paragraph 11 of the antenuptial agreement is a statement of full disclosure, and provides that wife "waives all presumption of fraud that may arise with full knowledge of her rights under the intestate laws and the Divorce Reform Code of the Commonwealth of Pennsylvania ... and further that she has certain rights which have been disclosed to her regarding the Pennsylvania Divorce Reform Code, all of which she has waived by this agreement." Paragraph 12 of the agreement is a reciprocal provision for the husband.

which she admitted that she signed an antenuptial agreement but argued that the agreement was not binding because it was not entered into voluntarily, because she had not had the advice of counsel in executing it, and because husband had not fully disclosed his financial status to her prior to its execution.

At a conciliation conference conducted by the Honorable R. Stanton Wettick, Jr., the case was designated complex and it was determined that the issue of the validity of the antenuptial agreement should be decided prior to further proceedings on the wife's claims for alimony and equitable distribution. Her claim for alimony pendente lite was permitted to proceed, however, and on March 2, 1988, following proceedings before a master and a hearing by the court on exceptions to the master's recommendation, counsel for both parties signed a consent order, entered by the Honorable Eugene B. Strassburger, III on March 4, 1988, stating that the previously filed exceptions were withdrawn. Accordingly, alimony pendente lite was set at $125.00 per month, retroactive to September 23, 1987, with arrearages of $569.00 through February 12, 1988 to be repaid at $100.00 per month.

Discovery in connection with the issue of the validity of the antenuptial agreement had been going on meanwhile, and after hearing argument on the legal issues involved, Judge Wettick filed an opinion and order holding that the agreement could not be set aside on the grounds that husband had failed to make a full and fair disclosure of his financial worth or that wife had not entered into it knowingly and voluntarily. Judge Wettick found that the agreement had been intended to bar all of wife's claims for economic relief, but concluded that, to the extent that the agreement contravened public policy favoring economic equity between divorcing parties, it was unenforceable.

Noting that the validity of broad waivers of the statutory rights created by the Divorce Code had not yet been determined by the appellate courts of Pennsylvania, Judge Wettick looked to the law of other jurisdictions for guidance.

Surveying the law of some of our sister states, Judge Wettick noted that many courts have found that the public policy in favor of insuring economic equity between parties to a divorce is contravened by enforcement of a marital agreement which is not substantively fair. This standard, he noted, differs from the standards of procedural fairness by which agreements determining the parties' rights upon the death of one spouse are usually judged. Judge Wettick acknowledged that the decisions of Pennsylvania courts which have addressed the validity of prenuptial waivers of economic rights incident to divorce have, without exception, assessed such agreements by the same standards applied to agreements in contemplation of death. *See, e.g., Gula v. Gula*, 380 Pa.Super. 249, 551 A.2d 324 (1988); *Simeone v. Simeone*, 380 Pa.Super. 37, 551 A.2d 219 (1988), *affirmed*, 525 Pa. 392, 581 A.2d 162 (1990); *Laub v. Laub*, 351 Pa.Super. 110, 505 A.2d 290 (1986). He distinguished those cases, however, on the basis that the agreements in question were entered into prior to the enactment of the Divorce Code, which stated a strong public policy of effectuating economic justice between parties who are divorced and mitigating the harm caused by dissolution of the marriage. In addition, he noted that section 103 of the Code, 23 P.S. § 103, explicitly removes agreements executed prior to the Code's enactment from the operation of its provisions. Judge Wettick reasoned that because the agreement in this case, unlike those addressed in previous Pennsylvania decisions, must be weighed against the stated goals of the Divorce Code, the standards of procedural fairness used in scrutinizing agreements in contemplation of death were no longer sufficient to comport with public policy. Instead, he stated, Pennsylvania should adopt a substantive fairness standard to be applied, in addition to the traditional tests, in determining the validity of an antenuptial agreement waiving statutory rights upon divorce. Accordingly, Judge Wettick held that antenuptial agreements waiving equitable distribution rights are violative of public policy, and hence unenforceable, if a spouse shows either that the agreement was unfair at execution or that there are significant

changed circumstances that render the agreement unfair as of the date of enforcement. With respect to alimony rights, the trial court concluded that an agreement violates public policy and will not be enforced if its enforcement would create an unjust result at the time alimony is sought.

Applying these legal conclusions to the instant agreement, Judge Wettick found that the validity of the specific waivers here could not be finally determined without the development of additional evidence. He therefore held that wife's economic claims could not be dismissed based upon the antenuptial agreement, but that at the hearing on each claim, the agreement would be assessed to determine whether its enforcement would violate public policy under the circumstances of this case.

Additional hearings were conducted in November and December of 1988, at the conclusion of which the trial court held that the agreement validly waived alimony, counsel fees and distribution of the value, including appreciation during the marriage, of property owned separately by the parties prior to marriage. However, Judge Wettick ruled that the waiver of rights to property acquired by the other spouse during the marriage was unenforceable because it gave an unfair advantage to the spouse working outside the home, who would be more likely to have the funds to acquire such property, and thereby contravened the policy that gives recognition to the value of services performed in the home and seeks to protect the economic interests of the spouse who performs such services instead of working for pay. Accordingly, he ruled that the entire marital portion of husband's pension fund should be awarded to wife and that wife should receive $50,000.00 from his investment plan, a figure that represented one-half of that portion of the plan's value which the trial court attributed to contributions made during the marriage. Post-trial motions were filed by both parties, but these were denied with the exception of adjustments made by the trial court in the source and manner of payment of the equitable distribution order.

A final decree was entered, and this timely appeal by husband followed.[2]

Husband frames four issues for our consideration:

1. Was the antenuptial agreement executed by the parties on August 19, 1981 a valid and enforceable waiver of all economic claims raised by Wife under the Pennsylvania Divorce Code of 1980?

2. Is the validity of an antenuptial agreement made after 1980 to be determined by application of the traditional test of full and fair disclosure of assets and rights waived or a reasonable provision for the intended spouse?

3. Under Section 401(e)(2) of the Divorce Code, can a party waive his rights to property acquired during the marriage in an antenuptial agreement?

4. Should Wife be required to repay to Husband the entire amount of alimony pendente lite she received during this litigation?

■ We agree with husband that the application of a substantive fairness standard to determine the validity of this agreement was improper. We therefore reverse the equitable distribution order entered by the trial court.

■ The determination of property rights through marital agreements has long been permitted, and, indeed, encouraged in Pennsylvania, *see, e.g., Fishblate v. Fishblate,* 238 Pa. 450, 86 A. 469 (1913) (settlements between husband and wife are favored in law as tending to adjust family disputes and in the absence of mistake or fraud will not be set aside), and a substantial body of case law governing their validity and enforceability has developed over the years. The right to enter into antenuptial agreements and have them recognized by our courts, thus allowing individuals to order their personal affairs as they see fit, is an essential element of the rights to privacy and to contract. These rights are central to our society, and antenuptial agreements are thus presumed to be valid and binding upon the parties. *In Re Estate of Hillegass,* 431 Pa. 144, 149,

2. Wife filed a cross-appeal, but discontinued it prior to argument.

244 A.2d 672, 675 (1968). While the enforcement of such agreements is generally a matter of contract law, our courts have recognized that because of the close relationship and emotional involvement of the parties to a marital agreement, they do not deal with each other at arm's length. For this reason, and because the very purpose of many marital agreements is to alter the property rights which our legislature has determined to be proper incidents of the marriage relationship, *Emery's Estate*, 362 Pa. 142, 147, 66 A.2d 262 (1949), the traditional contract requirement that an agreement be entered into without fraud, misrepresentation or duress was broadened in the context of marital contracts. Thus, a party to an antenuptial agreement could avoid its terms if he or she could show by clear and convincing evidence that the proponent of the agreement failed to make either a reasonable provision for the other party or a full and fair disclosure of his or her financial worth. *In Re Estate of Geyer*, 516 Pa. 492, 501, 533 A.2d 423, 427 (1987), *quoting In Re Estate of Hillegass, supra; see also Simeone v. Simeone*, 380 Pa.Super. 37, 551 A.2d 219 (1988).

Our supreme court granted allocatur in *Simeone*, and in its decision clarified the standard to be applied in determining the validity of antenuptial agreements. *See Simeone v. Simeone*, 525 Pa. 392, 581 A.2d 162 (1990). In *Simeone*, the supreme court addressed the validity of a prenuptial agreement executed by the parties in 1975, prior to enactment of the 1980 Divorce Code. The court reexamined the foundations of *Geyer, id.* 525 Pa. at 398, 581 A.2d at 165, and determined that judicial inquiry into the reasonableness of the parties' antenuptial agreement was inappropriate. 525 Pa. at 400, 581 A.2d at 166. The court retained the "full and fair disclosure" analysis, and stated that absent this disclosure, "a material misrepresentation in the inducement for entering a prenuptial agreement may be asserted. *Id.*, 525 Pa. at 403, 581 A.2d at 167, *citing Hillegass*, 431 Pa. at 152–53, 244 A.2d at 676–77.

Prior to our supreme court's pronouncement in *Simeone,* the courts of Pennsylvania held that the standards enunciated above governed the validity of all marital agreements, whether entered into before marriage, during the relationship, or upon separation. *In Re Ratony's Estate,* 443 Pa. 454, 277 A.2d 791 (1971); *see also In Re Kester's Estate,* 486 Pa. 349, 405 A.2d 1244 (1979). Further, with the exception of agreements found to constitute collusion to defeat the fault requirement of our former Divorce Law, *see, e.g., Miller v. Miller,* 284 Pa. 414, 131 A. 236 (1925), those standards had been applied both to provisions contemplating dissolution of a marriage and those contemplating death of a spouse. *In Re Ratony's Estate, supra; Gula v. Gula, supra; Simeone v. Simeone, supra; Nitkiewicz v. Nitkiewicz,* 369 Pa.Super. 504, 535 A.2d 664, appeal denied, 520 Pa. 589, 551 A.2d 216 (1988); *Laub v. Laub, supra.* Although the trial court was aware of this established case law, it determined that the present case was distinguishable because it presents an issue of first impression with respect to antenuptial agreements entered into after enactment of the Divorce Code. The trial court held that the policy goals of the Code require a radical departure from the treatment traditionally accorded marital agreements in this Commonwealth. We cannot agree.

The Divorce Code's policy of promoting economic equity and protecting financially dependent spouses in the context of a marital dissolution is virtually indistinguishable from that underlying the statutory right of a surviving spouse to elect against the decedent's will. In each case, the legislature has sought to protect a financially disadvantaged spouse from being left destitute by the designs of a marriage partner who has controlled the couple's finances during the course of the relationship. Similarly, underlying each statute is the recognition that the contributions of a spouse who does not work outside the home are valuable to the marriage and entitle that spouse to economic recompense in the event that the marriage ends. In the context of a spouse's right to elect against a will, the courts of this

Commonwealth have long held that the requirement of what the trial court has designated as "procedural fairness," i.e., either a fair provision for the challenging spouse or a full and fair disclosure of the proponent spouse's financial worth, is sufficient protection to insure that a waiver or modification of the statutory right was knowingly and voluntarily made. We can conceive of no reason to impose an additional requirement of "substantive fairness" to protect the identical policy concerns in the context of divorce.

We are able to discern no indication in the Divorce Code itself that any other result was intended by the legislature. The Code makes specific reference to marital agreements in three contexts: in section 103, which provides that the Code is to have no effect on agreements entered into prior to its effective date; in section 402(e), which provides that the parties may, by agreement, exclude property from the marital estate subject to equitable distribution; and in section 401.1, which provides that marital agreements may be enforced by any mechanism available to enforce a court order and that agreements regarding property rights, alimony, alimony pendente lite, counsel fees, or expenses may be modified only in accordance with their own terms.[3] Each of these provisions reflects a deferential attitude on the part of the legislature towards the parties' ordering of their affairs by agreement and a reluctance to interfere with the parties' freedom to contract. *Simeone*, too, recognizes the sanctity of the parties' decision to contract.

A court should not ignore the parties' expressed intent by proceeding to determine whether a prenuptial agreement was, in the court's view, reasonable at the time of its inception or the time of divorce. These are exactly the sorts of judicial determinations that such agreements are designed to avoid.

**3.** We refer to section 401.1, enacted February 12, 1988, only as a reflection of the policy considerations underlying the Divorce Code. We need not, and do not, decide whether that section could be invoked with regard to this agreement, which was executed prior to the section's effective date.

525 Pa. at 402, 581 A.2d at 166. The approach adopted by the trial court, far from treating such agreements with deference, would render them virtually meaningless because the enforceability of an agreement's provisions would be determined largely by events unknown and unknowable to the parties at the time they executed the agreement.

Although the Divorce Code is a relatively recent enactment, the policies it promotes did not spring into being overnight. This court's decision in *Gula v. Gula, supra,* and our supreme court's decision in *Simeone v. Simeone, supra,* albeit addressing agreements which were insulated from the Code's provisions by operation of section 103, required attention to the issue of whether statutory rights central to the Code could be validly waived by a party who did not know that they would arise. In *Simeone,* our supreme court held that a prenuptial agreement entered into prior to enactment of the Divorce Code would not be declared void on grounds that one party did not consult with independent counsel. As stated above, the court also discarded the prior approach which permitted inquiry into the reasonableness of a prenuptial agreement, noting that "the reasonableness of a prenuptial bargain is not a proper subject for judicial review." *Simeone,* 525 Pa. at 401, 581 A.2d at 166.

> Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied good bargains. [citation omitted].... To impose a per se requirement that parties entering a prenuptial agreement must obtain independent legal counsel would be contrary to traditional principles of contract law, and would constitute a paternalistic and unwarranted interference with the parties' freedom to enter contracts.

*Id.,* 525 Pa. at 400–401, 581 A.2d at 165–66. The court clarified an earlier opinion, *Estate of Geyer,* 516 Pa. 492, 533 A.2d 423 (1987) (Opinion Announcing Judgment of the Court), and reexamined the foundations upon which *Geyer*

and its predecessors rested. *See In re Hillegass Estate*, 431 Pa. 144, 244 A.2d 672 (1968). The court delineated the standards by which the validity of prenuptial agreements will be judged, noting that society's enlightenment has rendered meaningless the concepts upon which those earlier decisions were based.

> [T]he law has advanced to recognize the equal status of men and women in our society. *See, e.g.,* Pa. Const. art. 1, § 28 (constitutional prohibition of sexual discrimination in laws of the Commonwealth). Paternalistic presumptions and protections that arose to shelter women from the inferiorities and incapacities which they were perceived as having in earlier times have, appropriately, been discarded.

*Id.,* 525 Pa. at 399, 581 A.2d at 165.

The decision in *Simeone* recognizes that both parties to an antenuptial agreement, regardless of gender, stand on equal ground in the bargaining posture. The courts need not intervene to "protect" the intended wife from a deceiving suitor. *See Geyer, supra,* 516 Pa. at 511, 533 A.2d at 432 (Nix, C.J., dissenting). Paternal intervention, in the form of judicial determinations of whether the agreement was "reasonable," i.e., whether the contesting spouse was protected, has been discarded. *Simeone,* 525 Pa. at 399, 581 A.2d at 165.

Despite these expressions, the court cautioned that it was not departing from "the longstanding principle that a full and fair disclosure of the financial positions of the parties is required." *Id.,* 525 Pa. at 402–403, 581 A.2d at 167, *citing Hillegass Estate,* 431 Pa. 144, 152–53, 244 A.2d 672, 676–77 (1968). The concept of "full and fair disclosure" includes disclosure of statutory rights. *Geyer,* 516 Pa. at 506, 533 A.2d at 429.

> [I]t is fair and reasonable, as well as sound judicial policy, to require that any agreement which seeks to change the duly enacted public policy of this Commonwealth must be based on nothing less than full and fair disclosure. Such disclosure must include both the general financial pictures of the parties involved, and evidence that the par-

ties are aware of the statutory rights which they are relinquishing.

*Id.* (footnotes omitted).

█ Here, in determining that a waiver of statutory rights could occur so long as the traditional "full and fair disclosure" test was met, we can not be blind to the public policy favoring protection of a financially dependent spouse even though the actual statutory enactments of the Code could not affect the agreement. Because the public policy upon which the trial court based its decision *was* applicable in *Gula* and *Simeone,* we cannot agree that the fact that the Code's actual provisions did not apply was a sufficient distinction to allow the departure from precedent upon which the trial court embarked. Accordingly, in accordance with the longstanding principles set forth by our Supreme Court and most recently refined in *Simeone,* we hold that an antenuptial agreement waiving rights to equitable distribution, alimony, alimony pendente lite, counsel fees or expenses under the Divorce Code is presumed valid and will be given effect by our courts unless the contesting party can show that the proponent spouse failed to make a full and fair disclosure of his or her financial worth at the time the agreement was executed. This is consistent with traditional principles of contract law and our Supreme Court's recent pronouncement in *Simeone.*

█ This holding ends our inquiry with respect to the validity of the agreement in this case, for the trial court concluded that wife had failed to make such a showing in this case, and wife, by abandoning her cross-appeal, has not preserved any challenge to that conclusion. Husband's final claim, that wife should be required to repay all alimony pendente lite that she received, may also be rejected summarily. Although it is clear that the agreement was intended to bar any claim by wife for alimony pendente lite and that, under the foregoing analysis, that provision was valid and enforceable, it is equally clear that, on March 2, 1988, husband's counsel signed on his behalf a consent order withdrawing any objections to the award of alimony

pendente lite. A party who has acquiesced in an order or judgment will not later be heard to challenge it. *Brown v. Commonwealth, Department of Health*, 495 Pa. 456, 434 A.2d 1179 (1981), *quoting* 9 Standard Pennsylvania Practice Ch. 38, § 162, pp. 134–35.

The order of the trial court is reversed, and the case is remanded for entry of a decree dismissing all economic claims by wife on the basis that they are barred by the parties' antenuptial agreement.

FORD ELLIOTT, J., concurs in the result.