J-A11029-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| DOREEN ASHTON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRIAN ASHTON | : | |
| | : | |
| Appellant | : | No. 1249 MDA 2024 |

Appeal from the Order Entered August 1, 2024
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
201814073

BEFORE: MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:           **FILED: JULY 25, 2025**

Appellant, Brian Ashton ("Husband"), appeals from the order entered in the Luzerne County Court of Common Pleas, which granted the petition to enforce the property settlement agreement ("PSA") filed by Appellee, Doreen Ashton ("Wife"). We affirm.

The relevant facts and procedural history of this appeal are as follows. The parties were married on August 29, 2009. On December 7, 2018, Wife filed a divorce complaint. After various continuances and attempts to compel Husband to respond to interrogatories, the parties eventually executed the PSA on January 30, 2023. The PSA included an "equitable distribution" clause governing the disposition of the marital residence. This clause required the

_____

[*] Former Justice specially assigned to the Superior Court.

parties to list the residence for sale no later than February 15, 2023. (**See** PSA, dated 1/30/23, at ¶6(A)). Further, the PSA provided:

> The net proceeds shall be distributed 50% [to] Wife and 50% [to] Husband with the adjustment contained herein. The payoff of the loan shall be adjusted at the time of closing such that the balance of the loan as of January 1, 2023, if all payments through January 1, 2023, were made, shall be utilized. Each party shall then be equally responsible for any and all payments accruing from January 1, 2023 through closing, including payments for mortgages, taxes, insurance, maintenance, utilities, and costs associated with maintaining and preparing the property for sale.

(**Id.**) On May 10, 2023, the parties sold the marital residence for $267,005.57. On June 21, 2023, the court entered a decree in divorce, which incorporated the PSA into its terms.

On September 22, 2023, Husband filed a petition for special relief. In it, Husband acknowledged the sale of the marital residence, and he averred that the net proceeds from the sale were deposited into his attorney's IOLTA account. Although Husband's attorney had contacted Wife's attorney regarding the disbursement of these funds, Wife's attorney had yet to respond. Thus, Husband asked the court to enter an order authorizing his attorney to make an immediate disbursement of the funds, pursuant to the terms of the PSA.

Wife filed an answer to Husband's petition on October 16, 2023. Wife explained "that there was a dispute between the lender and the title company relative to a revised (increased) payoff. Said dispute was not resolved until September, 2023." (Answer, filed 10/16/23, at ¶6). Wife also claimed that

"there is outstanding information relative to the loan statement and the adjustment of the payoff of the loan pursuant to" the PSA. (*Id.*) Wife insisted that she "is unable to obtain the needed information due to the fact that she is not on the loan." (*Id.*)

After considering the parties' filings, the court ordered Husband's attorney to release $25,000.00 to each party. (*See* Order, filed 10/26/23, at ¶1). The court directed that the remaining funds would continue to be held in escrow "pending final agreement on the distribution in accordance with the [PSA]." (*Id.*) Additionally, "[a]ll documents necessary to be obtained from … the prior mortgage holder to calculate the appropriate distribution due to each party shall be provided within fourteen (14) days of this Order." (*Id.* at ¶2).

No further action occurred until May 20, 2024, when Wife filed a petition seeking enforcement of the PSA. Wife alleged that the sale of the marital residence yielded "net proceeds" in the amount of $99,397.24. (*See* Petition Seeking Enforcement, filed 5/20/24, at ¶5). Following the court-ordered release of $25,000.00 to each party, $49,397.24 remained in escrow. Regarding the division of the remaining proceeds, Wife asserted that Husband failed to make proper payments on the mortgage beginning in 2021. (*See id.* at ¶8). Wife insisted that Husband's failure to make these payments reduced the parties' equity in the residence:

> 9.   The Settlement Statement regarding the sale of the former marital residence sets forth the payoff to [the prior

mortgage holder] at the time of closing in the amount of $126,915.99 and a payment to PA SCDU in the amount of $3,493.58, [Husband's] obligation.[1]

10. The payoff of the loan at the time of closing had the payments been properly made would have been $95,747.09, thereby providing additional equity, specifically, the amount of $31,168.90.

(*Id.* at ¶¶9-10) (citations omitted).

Wife also cited the "post-agreement cooperation and enforcement" clause of the PSA, which stated that a "wrongdoing party shall bear the burden and obligation of any and all costs and expenses and counsel fees incurred by the other party in endeavoring to protect … her rights under [the PSA]." (*Id.* at ¶4) (quoting PSA at ¶15). Consequently, Wife argued that she was entitled to fifty percent of the $31,168.90 in lost equity, as well as fifty percent of the $49,397.24 that remained in escrow. (*See id.* at ¶12, ¶17). Wife also argued that, under the PSA, she was entitled to: 1) $1,746.79, which represented fifty percent of the child support obligation taken from the sale proceeds; 2) $4,606.92, which represented Husband's share of the marital credit card debt; 3) $321.74, which represented a reimbursement for plumbing and cleaning bills; and 4) counsel fees in the amount of $1,250.00. (*See id.* at ¶12-13,

---

[1] Although the record reveals that Husband and Wife have one minor child, the record does not explain the parties' history of debt to the Pennsylvania State Collection and Disbursement Unit. Nevertheless, at a July 2023 evidentiary hearing, Husband's counsel did not dispute that his client was obligated to pay some portion of the Domestic Relations attachment. (*See* N.T. Hearing, 7/23/24, at 7).

¶19).[2]

The court conducted an evidentiary hearing on July 23, 2024. At that time, the parties agreed that there was no need for testimony. (*See* N.T. Hearing at 3). Instead, the parties agreed to the introduction of specific exhibits. The exhibits included the payment history for the mortgage on the marital residence, the closing statement from the sale of the residence, invoices for house cleaning services, and an invoice for Wife's counsel fees. Following the admission of the exhibits, the court received argument from counsel:

> [Husband's] counsel argued that [Husband] "does not necessarily dispute the exhibits, just the distribution." [Husband's] counsel further argued specifically regarding Exhibit "E" that the cleaning was "something that [Wife] dealt with, not him, and [Husband] shouldn't be obligated to pay that." Husband's counsel argued that regarding the overall settlement, [Husband] believes that there should be an "even distribution of the proceeds [from the sale of the residence] minus the credit card, the Domestic Relations attachment and half of the bills." [Husband's] counsel additionally argued that during the time the martial residence was "waiting to be sold that nobody was paying the mortgage and therefore it should not be distributed as is requested by [Wife]."
>
> [Wife's] counsel argued that [Husband's] position "is contrary to the terms of the [PSA] which [Husband] signed." Additionally, [Wife's] counsel noted that [Husband] was living at the marital residence for free and [Wife] was

---

[2] Pursuant to the PSA, Wife conceded that she was responsible for fifty percent of the mortgage payments for the marital residence between January and April of 2023, which amounted to $2,869.58. (*See* Petition Seeking Enforcement at ¶14). Thus, Wife asked the court to order Husband to pay her a total of $44,088.94, plus the $1,250.00 in counsel fees. (*Id.* at ¶19).

subsidizing his living at the martial residence, which is "why we had an agreement with the term that we would use the payoff as of January [2023]" as part of the [PSA].

(Trial Court Opinion at 2-3) (record citations omitted).

On August 1, 2024, the court granted Wife's petition and directed Husband to pay $44,088.94 to Wife, along with $1,250.00 in counsel fees. Husband timely filed a notice of appeal on August 28, 2024. On September 5, 2024, the court ordered Husband to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Husband timely filed his Rule 1925(b) statement on September 25, 2024.

Husband now raises four issues for our review:

Did the trial court err and/or abuse its discretion in the granting of [Wife's] petition seeking enforcement of the [PSA] and requiring [Husband] to pay the sum of $44,088.94 to [Wife] and the sum of $1,250.00 to [counsel]?

Did the trial court err and/or abuse its discretion in the granting of [Wife's] petition seeking enforcement of the [PSA] on the basis of unstated credibility determinations of the parties?

Was the trial court, in consideration of all the facts and circumstances surrounding this [PSA], bound by special equitable principles to ensure a fair and just determination and settlement of property rights in divorces, in addition to applying regular contract principles?

Did the trial court err and/or abuse its discretion or commit an error of law as it appears from a review of the record that there is inadequate evidence to support the [trial] court's order?

(Husband's Brief at 3-4).

Husband's issues are related, and we address them together. Husband asserts that the court erred by awarding $44,088.94, plus counsel fees, to Wife. Husband insists that this award was contrary to the provisions of the PSA, which mandated that Wife receive exactly half of the proceeds from the sale of the marital residence. On appeal, Husband continues to rely on trial counsel's argument from the evidentiary hearing that there should have been "an even distribution" of these proceeds, minus certain minimal credits to Wife.[3] (*Id.* at 14). Moreover, Husband states the record contained inadequate evidence to support the order at issue, and the court did not adequately "consider and analyze all of the necessary elements as to the credibility of the parties because [the court] drew conclusions that are not based on testimony." (*Id.* at 16). Husband concludes that the court erred and abused its discretion by granting Wife's petition to enforce the PSA. We disagree.

"The determination of marital property rights through prenuptial, postnuptial and settlement agreements has long been permitted, and even encouraged. Both prenuptial and post-nuptial agreements are contracts and are governed by contract law." ***Holz v. Holz***, 850 A.2d 751, 757 (Pa.Super. 2004), *appeal denied*, 582 Pa. 700, 871 A.2d 192 (2005) (internal citations and quotation marks omitted). "In determining whether the trial court

---

[3] Current counsel did not represent Husband prior to this appeal. (***See*** Husband's Brief at 9).

properly applied contract principles, the reviewing Court must decide, based on all the evidence, whether the trial court committed an error of law or abuse of discretion." *Lewis v. Lewis*, 234 A.3d 706, 711 (Pa.Super. 2020) (quoting *Sams v. Sams*, 808 A.2d 206, 210 (Pa.Super. 2002)).  An abuse of discretion

> is synonymous with a failure to exercise a sound, reasonable, and legal discretion.  It is a strict legal term indicating that an appellate court is of the opinion that there was commission of an error of law by the trial court.  It does not imply intentional wrong or bad faith, or misconduct, nor any reflection on the judge but means the clearly erroneous conclusion and judgment—one that is clearly against logic and the effect of such facts as are presented in support of the application or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing; an improvident exercise of discretion; an error of law.

*Id.* (quoting *Adams v. Adams*, 848 A.2d 991, 992-93 (Pa.Super. 2004)).

"To the extent that we must decide a question of law, … our standard of review is *de novo*, and our scope of review is plenary." *Id.*

Additionally:

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties.  The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself.  The whole instrument must be taken together in arriving at contractual intent.  Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed.  **When a writing is clear and unequivocal, its meaning must be determined by its contents alone.**
>
> Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties.  A contract contains an ambiguity if it

- 8 -

is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

*Ramalingam v. Keller Williams Realty Group, Inc.*, 121 A.3d 1034, 1046 (Pa.Super. 2015) (emphasis in original). "[A]bsent fraud, misrepresentation, or duress, spouses should be bound by the terms of their agreements." *Stackhouse v. Zaretsky*, 900 A.2d 383, 386 (Pa.Super. 2006), *appeal denied*, 590 Pa. 669, 912 A.2d 838 (2006) (quoting *Simeone v. Simeone*, 525 Pa. 392, 400, 581 A.2d 162, 165 (1990)).

Instantly, the court granted Wife's petition and ordered Husband to pay $44,088.94, plus $1,250.00 in counsel fees. The order provided the following breakdown of Husband's obligations:

Fifteen thousand five hundred eighty-four dollars and forty-five cents ($15,584.45) representing half of the equity if payments on the property had been made on time.

One thousand seven hundred forty-six dollars and seventy-nine cents ($1,746.79) representing fifty percent of the child support obligation taken from the proceeds of the sale of the house.

Three hundred twenty-one dollars and seventy-four cents ($321.74) representing fifty percent of the plumbing bill and cleaning bill to proceed with the sale of the house.

Twenty-four thousand six hundred ninety-eight dollars and sixty-two cents ($24,698.62) representing fifty percent of escrow.

> [Wife] is responsible for fifty percent of the loan payment for January through April which totaled two thousand eight hundred sixty-nine dollars and fifty-eight cents ($2,869.58).

(Order, filed 8/1/24, at 1-2) (unnumbered).

Our review of the record reveals that sufficient evidence supported the court's determination. Husband correctly notes that the PSA required a fifty/fifty split of the net proceeds from the sale of the marital residence. (*See* PSA at ¶6(A)). The PSA, however, also provided that "[t]he payoff of the loan shall be adjusted at the time of closing such that the balance of the loan as of January 1, 2023, **if all payments through January 1, 2023 were made**, shall be utilized." (*Id.*) (emphasis added). Thus, the PSA contemplated that some payoff amounts might require adjustment if a party failed to make all mortgage payments.

Following the sale of the marital residence, Wife filed her petition seeking enforcement of the PSA. The petition included the payment history for the mortgage, which revealed that Husband failed to make certain payments. (*See* Petition Seeking Enforcement at Exhibit C). Considering these missed payments, Wife requested both fifty percent of the net proceeds from the sale and fifty percent of the additional equity that would have existed if Husband had made all necessary payments. Wife also requested counsel fees. Wife justified these requests by citing Paragraph 15 of the PSA, which established consequences for a party who committed "wrongdoing" with respect to the rights of the opposing party.

At the subsequent hearing, Husband did not present any evidence to dispute Wife's claim that there was a diminution in the net proceeds from the sale of the marital residence due to Husband's failure to make certain mortgage payments. Likewise, Husband provided no evidence to establish fraud, misrepresentation, or duress in the execution of the PSA. *See Stackhouse, supra*. Under these circumstances, and considering the clear and unequivocal language of the PSA, we cannot say that the court committed an error of law by ordering Husband to pay $44,088.94, plus an additional $1,250 in counsel fees. *See Lewis, supra*; *Ramalingam, supra*.

To the extent that Husband also complains about the adequacy of the evidence presented at the evidentiary hearing, Husband's counsel explicitly stated that "we don't dispute" the exhibits, and "we don't believe there's a need for additional testimony." (N.T. Hearing at 3). Absent more, we defer to the trial court's conclusions regarding the weight of the evidence at issue. *See Childress v. Bogosian*, 12 A.3d 448, 455 (Pa.Super. 2011) (explaining "it is within the province of the trial court to weigh the evidence and decide credibility and this Court will not reverse those determinations so long as they are supported by the evidence"). Accordingly, we affirm the order granting Wife's petition to enforce the PSA.

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>07/25/2025</u>