2020 PA Super 140

| | | |
|---|---|---|
| WILLIAM D. LEWIS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| CAMERON H. LEWIS | : | No. 2227 EDA 2019 |

Appeal from the Order Entered June 24, 2019
in the Court of Common Pleas of Monroe County,
Civil Division at No(s):  No. 580-DR-2016,
No. 6265-CV-2017.

BEFORE:  LAZARUS, J., KUNSELMAN, J., and McCAFFERY, J.

OPINION BY KUNSELMAN, J.:                          Filed:  June 12, 2020

At issue in this appeal is the validity of a post-nuptial settlement agreement executed between Appellant William Lewis (Husband) and Appellee Cameron Lewis (Wife).  Husband petitioned for enforcement of the settlement agreement and for Wife's contempt of the same.  Wife counter-petitioned, claiming she only signed the agreement under duress, in constant fear of Husband's punishing retribution, in a daze from his manipulation of her medication, and without the opportunity to consult an attorney.  Alternatively, Wife alleged fraud in the inducement, claiming Husband deceived her into believing the document was a legal fiction, a mere paper trail he needed for his employment, and not a settlement of their marital property incident to a divorce.  After two days of testimony, the trial court took the extraordinary

measure of invalidating the settlement agreement on both of these grounds. Husband appeals, and after careful review, we affirm.

The complex factual and procedural history of this case is as follows: The parties met in March 2013 when Husband hired Wife to provide childcare to his two children. At that time, Wife was 20 and Husband was 46. Within three weeks they married. Wife dropped out of college and became a stay-at-home stepmom. The parties had a daughter of their own the following year. Their marriage soon became tumultuous, as evinced by multiple legal proceedings. Throughout those proceedings, Husband maintained Wife suffered from various psychiatric disorders and that he was the victim of her physical abuse. In June 2016, Husband obtained a Protection From Abuse (PFA) order against Wife, which he claimed she repeatedly violated. This led to criminal charges, findings of contempt, and ultimately Wife's incarceration.

Then the truth was unveiled. In a July 2018 PFA hearing, evidence revealed Husband was the actual perpetrator of the abuse, and that once he was armed with the June 2016 PFA order, Husband used it as a weapon against Wife. Husband would invite Wife back to the marital home and then file contempt charges against her. The court concluded "Husband had been playing the system, using the Monroe Court of Common Pleas as one tool in furtherance of his very calculated, complex, web of domestic violence, control and intimidation against Wife." *See* Trial Court Opinion (T.C.O. 1), 6/24/19, at 1. The court granted Wife's July 2018 PFA petition and awarded her exclusive possession of the marital residence and temporary sole custody of

the parties' child.[1] Husband appealed that decision, and we affirmed. *See* ***C.H.L. v. W.D.L.***, 214 A.3d 1272 (Pa. Super. 2019).

This appeal concerns the circumstances under which the parties executed their post-nuptial settlement agreement. Although we particularize the facts in our analysis below, we provide this summary by way of general background. In December 2016, following Husband's extensive abuse, including his manipulation of Wife's mental health and medication, Wife attempted suicide. While she recovered in a psychiatric hospital, Husband broached the idea of her signing a settlement agreement, which he assured her was simply a paper trail he needed to show his employer (the federal government) that he was separated from his "crazy wife," or else his security clearance would be jeopardized.

Wife was released from the hospital before Christmas 2016, but her mental and physical state did not improve. Husband continued dispensing Wife's medication to make her feel nauseous and apathetic. On January 10, 2017, Wife met with her psychiatrist to change her medication. Still, the medication's side effects remained unbearable, so three days later, on morning of January 13, 2017, Wife went back to the psychiatrist. Husband forced his attendance at these psychiatry appointments.

According to Wife, when the parties returned to their car after the second appointment, Husband gave her the settlement agreement. He

---

[1] The court denied Husband's cross-petition.

allowed Wife ten minutes to review it as he drove her to a notary public. Husband reiterated that the settlement agreement was simply a paper trail he needed for work and that they would not divorce. When Wife told him she did not feel comfortable signing anything without consulting an attorney, Husband responded, "If you dare get a lawyer, I'm divorcing you and you will never see your daughter again." Wife said she believed this threat, because in the past, Husband inflicted punishments when she disobeyed him.

While Husband waited in the car, Wife had the agreement notarized by Steven Garvey, an acquaintance of Husband. Husband told Wife he could not come into the notary's office with her, or else it would look like he was forcing her to sign it. After Wife had her signature notarized, the parties drove to Husband's counsel, where he had his signature notarized while Wife waited in the car. The parties then returned home. Wife claimed she did not read the January 13, 2017 settlement agreement before she signed it. Wife asked Husband for a copy, but he refused to provide one. Until July 2018, the only time the parties discussed the settlement agreement was when Husband threatened Wife with divorce and reminded her she was entitled to nothing.

By virtue of the July 2018 PFA order, Wife received exclusive possession of the marital residence. Husband then filed a petition to enforce the settlement agreement, asserting his right to exclusive possession of the marital home; he also sought to hold Wife in contempt of that agreement. Wife filed a counter-petition challenging the validity of the settlement

agreement on grounds of duress and fraud in the inducement. The trial court held a hearing on the matter on November 19, 2018 and February 1, 2019.

On June 24, 2019, the court issued an order invaliding the settlement agreement on the grounds of duress and fraud; the court dismissed Husband's petition as moot. The court issued a contemporaneous opinion explaining its decision. *See* T.C.O. 1, at 1-45. Upon receiving Husband's timely-filed concise statement of matters complained of on appeal, the court issued another opinion pursuant to Pa.R.A.P. 1925(a) to supplement its previous one. *See* Supplemental Trial Court Opinion (T.C.O. 2), 9/16/19, at 1-10.

Husband presents three issues for our review:

1. Whether the trial court erred and abused its discretion in invalidating the divorce settlement agreement dated January 13, 2017, which was duly executed by the parties, on the grounds of duress?

2. Whether the trial court erred and abused its discretion by invalidating the divorce settlement agreement dated January 13, 2017, which was duly executed by the parties, on the grounds of intentional fraud in the inducement?

3. Whether the trial court erred and abused its discretion by relying upon past court proceedings informing the basis of its opinion, thereby exhibiting an appearance of bias?

Husband's Brief at 7.

At the outset, we observe the relevant standards of review. Settlement agreements are subject to contract principles. *See Sams v. Sams*, 808 A.2d 206, 210 (Pa. Super. 2002). "In determining whether the trial court properly

applied contract principles, the reviewing Court must decide, based on all the evidence, whether the trial court committed an error of law or abuse of discretion." **Id.** (citation omitted). We have said an abuse of discretion

> is synonymous with a failure to exercise a sound, reasonable, and legal discretion. It is a strict legal term indicating that an appellate court is of the opinion that there was commission of an error of law by the trial court. It does not imply intentional wrong or bad faith, or misconduct, nor any reflection on the judge but means the clearly erroneous conclusion and judgment—one that is clearly against logic and the effect of such facts as are presented in support of the application or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing; an improvident exercise of discretion; an error of law.

**Adams v. Adams**, 848 A.2d 991, 993-993 (Pa. Super. 2004) (citation omitted). In conducting appellate review, "[w]e will not usurp the trial court's fact-finding function." **Stackhouse v. Zaretsky**, 900 A.2d 383, 386 (Pa. Super. 2006). (citations omitted). To the extent that we must decide a question of law, however, our standard of review is *de novo*, and our scope of review is plenary. **See, e.g., Stoner v. Stoner**, 819 A.2d 529, 530 n.1 (Pa. 2003).

In his first issue, Husband contends the court abused its discretion when it invalidated the parties' settlement agreement on grounds of duress. His argument is twofold: first, Husband argues the record did not support the court's findings; and second, even if the court's factual findings stand, they do not constitute duress as a matter of law. We discuss each argument in turn.

By claiming the record did not support the trial court's findings, Husband takes primary aim at the court's credibility determinations. It is well-settled that this Court is bound by the trial court's credibility determinations. ***See, e.g., Stamerro v. Stamerro***, 889 A.2d 1251 (Pa. Super. 2005). This Court has explained how we review credibility determinations:

> We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings.

***V.B. v. J.E.B.***, 55 A.3d 1193, 1198 (Pa. Super. 2012) (citations omitted).

Here, credibility was paramount, as the trial court's decision relied almost exclusively on Wife's testimony to reach its decision. The court emphatically concluded that Wife's testimony was "wholly credible" and Husband's testimony was "wholly incredible" and downright misleading. Although Husband concedes credibility determinations are within the purview of the trial court, he argues we should discount them. He asserts Wife's testimony was impeached not only by her previous words and deeds, but also by Husband's two witnesses.

As to Wife's prior conduct, Husband points to her admitted criminal history of making a false rape report to police about an ex-boyfriend. Husband also notes Wife sent him contradictory letters of affection while she was incarcerated, in which she stated she was thankful for having him in her life,

that he was "honest, good looking, smart, sexy, [and] loyal[.]" **See** N.T., 11/19/18, (Day 1) at 56.  She also wrote she was sorry for "being a horrible person," for hurting Husband, and for lying to him. **Id.**

Additionally, Husband cites the testimony of his two witnesses, who were the only other witnesses besides the parties.  Husband highlights the testimony of Samuel Jones, who made home repairs for Husband, and who stated he once witnessed Wife lie about being abused:

> […] I was there one night, the night the water tank blew up, so I just finished the water tank and, you know, like I know [Husband] and [Wife] were, you know, arguing upstairs, and [Husband] came downstairs to kind of escape from it and [we] were like talking and I guess [Wife] had no idea that I was downstairs at that time, you know, or [Husband] wasn't downstairs with me, but she fell down the stairs and then she proclaimed that [Husband] threw herself down the stairs, and he was standing right next to me, and after that I said you know what, this is just like complete chaos, craziness here, I said I'm sorry [Husband], you know, like you gotta find somebody else to come over here and you know do work, I just, I can't put myself in these situations.

N.T., 2/1/19, (Day 2), at 8-9.

Mr. Jones also testified about an argument between the parties on January 13, 2017, the day the parties executed the settlement agreement.

> So I remember standing there and [Husband] was doing some, you know, work on his laptop or whatever, you know because we were talking back and forth in between, you know, me working there, and you know, she had, then they like erupted into an argument and [Husband] said listen, this isn't the time, you know, like this isn't the time for this right now, we have people working inside the house, and you know, she took the papers that she had and threw them

> on the table and said here, you wanted it, you got it, and then she stormed out.

*Id.* at 7.

Lastly, Husband cites the testimony of Steven Garvey, his acquaintance and the notary public who notarized the settlement agreement for Wife. Contrary to Husband's characterization of the testimony (that the witness did not find anything out of the ordinary regarding Wife's demeanor), Mr. Garvey stated he did not recall Wife's demeanor. *Id.* at 16. However, Mr. Garvey also testified he did not see Husband in the parking lot.

Wife did not take the stand to rebut the testimony of either witness, but she did address her own contradictory statements. Regarding her previous statements to Husband, Wife explained:

> I lied in these letters [to Husband] because it's the only, it's the only place I have to go after jail. It's the only thing I have in life, and if I really wrote down what I felt, he would have cut me off like I was a piece of trash. So I said whatever I needed to say to come back home and figure everything out. I was feeding his ego.

N.T. (Day 1) at 57-58. Wife also testified that Husband put money "on my books" (presumably her commissary fund) and that he asked her to write him letters to prove that she wanted to be with him. *Id.* at 53-54.

Regarding her previous false statements to police, Wife explained:

> Alright, I was married to [Husband], I didn't want to be married, I wanted nothing to do with it three months into marriage, so I went and I slept with my ex-boyfriend. This is going to look really bad, but I'm just going to say it, I told [Husband] about this, I told him what I did, and he said if you want to be with me you need to go to the police station

and you need to file rape charges. I told him, I said that's not what happened, he goes I don't care, so I did it. It was found unfounded and I got a hundred hours community service and a year of good behavior [*i.e.* probation]. So yes I have been [arrested and convicted of making false statements to the authorities].

*Id.* at 58-59.

The court addressed the credibility issues in its opinion accompanying the order:

Given the circumstantial evidence surrounding the notarized [settlement agreement], [the psychiatrist's] records showing Husband's attendance, and the conflicting direct testimony from Husband's own witness, Mr. Jones, which all weigh in favor of Wife's account and against Husband's, [the court] find[s] Husband's testimony to be wholly incredible.

Furthermore, Husband had an argumentative demeanor on the stand and, as [the court] remarked on the record, a clear agenda in his testimony. [The court] highly suspect[s] Husband attempted to mislead [this court] in furtherance of that agenda, and [the court] caution[s] him against such misleading testimony in future proceedings.

[The court] find[s] incredible Mr. Jones's testimony because it conflicts with Husband's testimony[.] While the court find[s] Mr. Garvey credible, [the court] do[es] not weigh his testimony heavily in [its] decision as he is unable to remember when Wife arrived at his office, nor her demeanor on that day, nor the vehicle in which she left. [The court] find[s] Wife wholly credible. Wife's demeanor in testifying, consistency with prior testimony before this [c]ourt, and willingness to expose her own disobedience of a court order, along with the circumstantial evidence surrounding the notarized [settlement agreement] and [the psychiatrist's] records confirm Husband's attendance, all lend credence to her account of the events on January 13, 2017.

T.C.O. 1 at 31-32.

- 10 -

Husband believes the trial court erred because his two witnesses' testimony deserve more weight. For support, he cites **Sobel v. Sobel**, 254 A.2d 649, 651 (Pa. 1969) for the proposition that "a person's mental capacity is best determined by spoken words and conduct, and the testimony of persons who observed such conduct on the date in question outranks testimony as to observations made prior to and subsequent that date."

Husband's reliance is misplaced. **Sobel** concerned a person's competency to make an *inter vivos* gift. It has little bearing on the issue of witness credibility. More to the point, Husband's witnesses were not privy to the moments encompassing the duress; they had no knowledge of the threats Husband made to Wife in the car, nor the danger she faced if she failed to comply.

We do not dispute Husband's contention that the above testimony, if reweighed, could have painted an entirely different picture. The problem with Husband's argument is he mistakenly believes it is our role to reweigh evidence. As we stated in **Stackhouse**, **supra**, "We will not usurp the trial court's fact-finding function." After all, "[i]t was within the province of the [trial court] as fact-finder to resolve all issues of credibility, resolve conflicts in evidence, make reasonable inferences from the evidence, believe all, none, or some of the evidence, and ultimately adjudge [the parties]." **Commonwealth v. Charlton**, 902 A.2d 554, 562 (Pa. Super. 2006).

Here, the trial court heard Husband's attempts to impeach Wife's credibility, as well as Wife's explanations for the things and she did and said.

The trial court simply believed Wife. The court also heard Husband's witnesses testify about various anecdotes and impressions from certain interactions with the parties. The court did not find them particularly useful.

Most significantly, the court's credibility determinations did not rest solely on testimony. What appeared more persuasive for the court, was not so much the testimony of the witnesses, but two separate documents: the psychiatrist's record of attendance; and the notarization page of the settlement agreement. These documents corroborated Wife's timeline of events on January 13, 2017 – the day the parties executed the settlement agreement – and they directly refuted Husband's story. Husband testified he worked that day and had his signature of the settlement agreement notarized the following Monday, January 16. However, the psychiatrist's record indicated Husband attended the morning appointment on January 13; and the settlement agreement indicated Husband had his signature notarized on January 13. Furthermore, Husband's version of events also conflicted with his own witness, Mr. Jones, who testified Husband was present while Mr. Jones worked in the home. When Husband was confronted with these inconsistences, the court observed Husband become argumentative and evasive.

In the end, the court had to ascertain the true story of what happened, from four witnesses, whose accounts partially overlapped with one another's. Surely the court faced a dilemma, whether to believe an imperfect Wife on the witness stand after she admitted to lying in previous instances. Such is a task

we do not relish, and, without having the benefit of observing the parties firsthand, one we cannot perform. The court ultimately chose to believe Wife. We cannot say this decision was so unreasonable or improvident that it constituted an abuse of discretion. **See Adams**, **supra.**

Having discerned that the record supports the trial court's factual findings, we turn now to the second part of Husband's duress claim, *i.e.*, whether Wife's allegations constituted duress as a matter of law. To begin this discussion, we return to contract principles.

Settlement agreements, whether pre-nuptial or post-nuptial, are contracts and thus governed by the same rules of law used in determining the validity of contracts. **See id.**, 848 A.2d at 993 (citation omitted); **see also Stackhouse**, 900 A.2d at 386. Absent fraud, misrepresentation, or duress, parties are generally bound by the terms of their agreements. **Adams**, 848 A.2d at 993 (citation omitted); **see also Simeone v. Simeone**, 581 A.2d 162, 165 (Pa. 1990). Mutual assent is necessary to enter into a contract; mutual assent does not exist however, when one of the contracting parties elicits the assent of the other contracting party by means of duress. **See Adams**, 848 A.2d at 993 (citation omitted). Because settlement agreements are presumed valid and binding, the party seeking to avoid or nullify the agreement has the burden of proving the invalidity of the agreement by clear and convincing evidence. **See In re Ratony's Estate**, 277 A.2d 791, 795 (Pa. 1971).

Our Supreme Court defined duress as follows:

that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness. The quality of firmness is assumed to exist in every person competent to contract, unless it appears that by reason of old age or other sufficient cause he is weak or infirm. Where persons deal with each other on equal terms and at arm's length, there is a presumption that the person alleging duress possesses ordinary firmness. Moreover, in the absence of threats of actual bodily harm there can be no duress where the contracting party is free to consult with counsel.

*Carrier v. William Penn Broadcasting Co.*, 233 A.2d 519, 521 (Pa. 1967);

The Supreme Court has also employed this definition when analyzing duress claims involving settlement agreements between spouses. *See Simeone*, 581 A.2d at 167 (citing *Carrier*, 233 A.2d at 521).

In our review of the relevant Pennsylvania case law, no spouse has ever convinced a court to void a settlement agreement on grounds of duress. There have been many instances where the party claiming duress suffered unseemly pressures to sign an agreement, but in each case, the courts concluded that those pressures did not constitute duress in the legal sense. For instance, in *Simeone*, *supra*, the claimant alleged she was forced to sign a prenuptial agreement on the eve of her wedding, "a time when she could not seek counsel without the trauma, expense, and embarrassment of postponing the wedding." *Id.*, 581 A.2d at 167. Likewise, in *Hamilton v. Hamilton*, 591 A.2d 720, 722 (Pa. Super. 1991), the claimant alleged she was told that without a prenuptial agreement, there would be no wedding, notwithstanding the fact that "she was pregnant, unemployed, and probably frightened." In

*Lugg v. Lugg*, 64 A.3d 1109, 1113-1114 (Pa. Super. 2013), we concluded that "[d]aily badgering and one and one-half hours of 'pressure and negotiations' does not rise to the level of coercion necessary to find duress."

Husband argues the instant case is "strikingly similar" to **Adams**, **supra**, and he is entitled to relief as a matter of law. **See** Husband's Brief at 33. In **Adams**, a wife alleged she entered her marriage settlement agreement under duress. The trial court denied her claim. On appeal, the wife argued "the court failed to recognize her low self-esteem, dominance by an abusive husband, fear of the judicial system, treatment for attention deficit disorder, and alcoholism as evidence of her incapacity to assent." **Adams**, 848 A.2d at 993. We disagreed and affirmed the trial court.

Whether the facts found by the trial court constitute duress as a matter of law is a purely legal question for which our scope of review is plenary, and our standard of review is *de novo*. **See Stoner**, **supra**. Using the first clause of the duress definition, we initially look at the "degree of restraint or danger, either actually inflicted or threatened and impending…" **See Carrier**, **supra**.

Here, Wife testified that she believed she had to sign the agreement, that she was constantly afraid of Husband and the punishments he doled out when she disobeyed him. **See** N.T. (Day 1) at 21-22, 27. Wife stated a common punishment was that Husband kicked Wife out of the house, locked the doors, and forced her to sleep on the porch. **Id.** at 23. Although she was unsure how often Husband did this, she tallied the figure at more than ten times over the course of their short marriage. **Id.** Beyond this degradation,

Husband had begun physically abusing her prior to the execution of the settlement agreement. ***Id.*** at 53. Wife explained: "So it was always this manipulation of 'if you go against this, I'll do what I have always done in the past and make sure you pay for it.'" ***Id.***

Beyond the looming consequences for Wife's disobedience, we also observe Husband's specific threat to Wife in the car on the way to the notary: if Wife did not sign the agreement, he would ensure she never saw their daughter again. ***Id.*** at 21. By January 2017, when they entered this agreement, Husband had already been exploiting the judicial system to control Wife. For example, after obtaining a PFA against Wife in June 2016, Husband twice invited her back into the home and then filed for criminal contempt. In fact, on the day the parties executed the agreement, a second contempt petition was pending. Further, Wife testified that Husband had previously threatened to "file an Amber Alert" if Wife took their daughter to the park. ***Id.*** at 23. Finally, while there was no testimony that Husband "actually inflicted" physical abuse in the car while driving to the notary, Wife's testimony made clear the restraint on her will was "threatened" and the danger to her person was "impending."

We next look at the second clause of the duress definition, *i.e.*, whether the restraint or danger was "sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness." ***See Carrier***, ***supra***. Regarding the "severity and apprehension" of the danger, Wife testified that another one of Husband's preferred punishments was to drain the parties' joint bank

account so she had no access to money. *See* N.T. (Day 1) at 23. Although we do not categorize financial hardship as "danger," we cannot ignore that Husband controlled Wife's finances. The severity and apprehension of Husband's abuse were intensified, because without financial resources, Wife's ability to escape the abuse was limited.

The next part of the duress analysis is whether a person of ordinary firmness could overcome the aforementioned degree of restraint and danger. Importantly, we observe the trial court's conclusion that Wife did not even possess "ordinary firmness" on account of "1) Husband's control over Wife, through intense and sustained domestic abuse; 2) Wife's attempted suicide in close proximity to the execution of the [settlement agreement]; and 3) Wife's heavy medication, which caused her to feel nauseous and apathetic." T.C.O. 1 at 39.

We must clarify the duress inquiry on this point: when determining whether a party could overcome the restraint or danger, may the court consider that party's unique state of mind, or must the court only consider the state of mind of the "ordinary person." In other words, is the test subjective or objective?

The line of cases comprising the duress definition suggests that the inquiry begins as an objective test, but if the presumption of "ordinary firmness" is rebutted, the inquiry shifts to a subjective test. *See Carrier*, 233 A.2d at 521 ("The quality of firmness is assumed to exist in every person competent to contract, unless it appears that by reason of old age or other

sufficient cause he is weak or infirm."); *see also Irwin v. Weikel*, 127 A. 612, 614-615 (Pa. 1925) (holding that the party claiming duress did not controvert presumption of ordinary firmness)).[2]

The unique nature of a marriage contract also supports the potential use of a subjective test. *Carrier* provides, "[w]here persons deal with each other on equal terms and *at arm's length*, there is a presumption that the person alleging duress possesses ordinary firmness." *Carrier*, 233 A.2d at 521 (emphasis added). But our Supreme Court "recognized in *Simeone* that 'parties to [marriage contracts] do not quite deal at arm's length, but rather at the time the contract is entered into stand in a relation of mutual confidence and trust….'" *Stoner*, 819 A.2d at 533 (quoting *Simeone*, 581 A.2d at 167).

Although the *Stoner* excerpt concerned the full disclosure of assets as a necessary requirement of marital contract formation, its rationale applies in this context. After all, mutual assent (free from duress) is also a necessary requirement of marital contract formation. Unlike individuals making business deals, parties to a marriage contract do not quite deal at arm's length; each party has intimate knowledge of whether the other party is weak or infirm. In

_____

[2] The Supreme Court's *Carrier* definition is taken entirely from *Smith v. Lenchner*, 205 A.2d 626, 628 (Pa. Super. 1964), which in turn cites, *inter alia*, *Irwin*. We do not employ the Restatement (Second) of Contracts when the seminal *Simeone* favored *Carrier* instead. Such an avenue appears doubly foreclosed considering that the Restatement (Second) explicitly omits the term "ordinary firmness" for its "vagueness and impracticability." *See* Restatement (Second) of Contracts § 175 (comment b).

a duress case, it would be absurd to preclude the court from considering these subjective weaknesses or infirmities, if proven by sufficient evidence, in favor of an objective "ordinary person" standard.

In other words, we presume a duress claimant has ordinary firmness, but a claimant can rebut that presumption if the claimant shows sufficient evidence of weakness or infirmity.[3] Instantly, Wife had been under psychiatric care for some time prior to the execution of the settlement agreement. Additionally, when she saw her psychiatrist, Husband made sure he attended. *See* N.T. Day 1, at 13. Wife testified, "I would tell him I don't want you to be in here with me, and he would be like well, you're on my insurance so either

---

[3] In its opinion, the trial court invites us to carve out an automatic "battered spouse syndrome" exception to the duress case law. The thinking goes, if a claimant was a victim of domestic violence, then she has a *per se* weakness or infirmity when contracting with her abuser. The trial court opined: "'Battered woman syndrome' recognizes that a battered person faces repeated and continued force from their abuser, whether that be physical or psychological, and that such force is coercive." T.C.O. 1 at 37 (citing ***Commonwealth v. Stonehouse***, 555 A.2d 772, 783 (Pa. 1989) (holding that battered spouse syndrome was a defense to homicide)).

We note first that battered spouse syndrome is not within the ordinary training, knowledge, intelligence and experience of a fact-finder, and thus such a legal defense would require expert testimony. ***See Stonehouse***, 555 A.2d at 782-783. In this case, no such expert testimony was offered. More to the point, we must recognize our role. "The Superior Court is an error correcting court and we are obliged to apply the decisional law as determined by the Supreme Court of Pennsylvania." ***Matter of M.P.***, 204 A.3d 976, 986 (Pa. Super. 2019) (citation omitted). "It is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand legal doctrines. Such is a province reserved to the Supreme Court." ***Id.*** (citation omitted). For those reasons, we decline to carve out a *per se* exception in this case.

you let me go or I'm not paying for your appointment." *Id.* On at least one occasion, Husband successfully suggested an unnecessary diagnosis; Wife testified:

> I used to go to the psychiatrist's office, [Husband] was present, I would tell them there's a GPS tracker on my car, he manipulates me, he's mean, and he knows what I'm doing, where I'm doing, he's all involved in my life. He's going through my phone constantly, he text messages himself from my phone to think I'm crazy, and [Husband] would be[,] ["]I told you she's schizophrenic, I told you she's acting crazy.["] So I would get angry and I would go off, because I don't have a voice, and the psychiatrist is believing him, so at one point in time, oh she's schizophrenic, so yes, you can say I was diagnosed schizophrenic.

*Id.* at 44.

As a result of Husband's dominance and Wife's reaction to it, Wife was prescribed unnecessary medications. Moreover, Wife did not understand what medications she took, because Husband kept them under lock and key, and refused to tell her what they were or what they were for. *Id.* at 13. By December 2016, Wife's mental state deteriorated as she endured Husband's abuse. *Id.* at 10. After Husband told Wife to "leave his F'ing house," that she would never see her daughter again, and after his malevolent urging that she kill herself, Wife attempted suicide. *Id.*

After taking her to the hospital, Husband had Wife involuntarily committed to a psychiatric hospital. While she was committed, Husband visited her, and for the first time, mentioned the idea of signing a separation agreement. In late December 2016, Wife left the psychiatric hospital, but she

still felt physically and psychologically unstable. *Id.* at 17. On January 10, 2017, Wife went to see the psychiatrist, with Husband in attendance. Wife wanted to go back to the hospital; she said she felt "like I was losing my mind, like I was going crazy." *Id.* at 18. The psychiatrist changed Wife's medication, although Wife did not know how the medication was changed as Husband continued to dispense the pills. Three days later, in the morning of January 13, Wife went back to the psychiatrist. Wife testified,

> I called them because at this point I'm really sick, everything I eat I'm like throwing up, and I'm just like, I felt like I was like a zombie to the world, like, for example, like the house could have been burning and I really wouldn't have care. I was just out of it completely.

*Id.* at 20. Following this appointment, Husband drove her to the notary so she could sign the settlement agreement he had drafted.

Once Wife was finally able to free herself from the cycle of domestic violence by obtaining a PFA in 2018, she was able to have a voice in her own mental health. She testified that none of the antidepressants or mood stabilizers were necessary, and that their numbing effect had caused her to accept Husband's behavior and believe his absurd threats. *See id.* at 27-28.

Given Husband's infliction of systematic mental and physical abuse, and given the side effects of the unnecessary medication that Husband controlled, we conclude Wife rebutted the presumption that she possessed ordinary firmness at the time she signed the settlement agreement. Thus, the court properly considered Wife's individual state of mind. Likewise, we consider this

finding to determine whether Wife met the legal definition of duress; *i.e.*, Wife's ability to overcome the degree of restraint and danger Husband imposed on her.

When Wife signed the settlement agreement, she faced both impending physical danger, and Husband's explicit threat that she would never see her child again unless she signed it. The physical danger and the explicit threat operated as a restraint of Wife's free will. Because Husband had followed through with his threatened punishments before, including his improper use of the legal system to obtain sole custody, these threats caused Wife apprehension. Moreover, Wife was in a mentally and physically weakened state to resist this restraint and danger, due to the unnecessary medications Husband gave her. In short, the degree of threatened restraint and impending danger was sufficient in severity and apprehension to overcome Wife's personal state of mind.

Wife has met the legal definition of duress up to this point, but the duress analysis does not necessarily end here. Our Supreme Court has said, "In the absence of threats of actual bodily harm there can be no duress where the contracting party is free to consult with counsel." **See Carrier**, **supra**. Because we conclude that the danger Wife faced was the impending threat of actual bodily harm, we do not have to decide whether Wife had the opportunity to consult counsel. Still, we acknowledge that the threat of actual bodily harm was not explicitly verbalized by Husband in the car on the way to the notary. However, even if Husband's impending physical abuse – abuse he previously

- 22 -

inflicted as punishment for her noncompliance – did not equate a "threat of actual bodily harm," we would still conclude Wife has met the legal definition of duress. This is because Wife did not have the opportunity to consult with counsel.

In our case law, the duress claimant's ability to consult with an attorney has often proved to be fatal to the claim. No matter how reprehensible the negotiation tactics were, if the claimant was able to consult with an attorney, the danger or restraint could not have been sufficiently severe to constitute legal duress. In **Adams**, the claimant consulted her attorney on multiple occasions prior to entering the agreement. 848 A.2d at 994. In **Hamilton**, not only did the claimant have an opportunity to consult with an attorney, her attorney even advised her not to sign the agreement. 591 A.2d at 722.

Instantly, the court concluded Wife had no such opportunity, based in part upon Wife's testimony that Husband told her she would never see her daughter again if she dared consult counsel. **See** T.C.O. 1 at 42. Husband primarily relies on his own testimony to argue there is "substantial support" in the record that Wife had ample opportunity to consult an attorney.

At trial, Husband testified he sent Wife the draft of the settlement agreement in August 2016, approximately five months prior to the parties' execution of the agreement. **See** N.T. (Day 2) at 21-22. Although Husband did not furnish the draft at trial, he did confront Wife with one of her text messages where Husband purported she acknowledged the draft. Wife's text

stated, "Wow I got my divorce papers today, guess that was my birthday surprise." ***See*** N.T. (Day 1) at 35.

Wife testified these "divorce papers" from August 2016 did not include the settlement agreement that she executed in January 2017:

> **Wife**: [I]f I remember correctly I did get papers, but these papers, now, they, were divorce papers, [Husband] has been talking about divorce for years, it's always been his key, but these papers was, it wasn't if I remember it wasn't like a stack of papers, it was like four or five pages long and I'm like what do you want me to do with these, he's like just sign them and send them back. So yes, I did send those text[s], like I did, I did get papers but it was for the divorce, like it, divorce papers, I believe, that was it. There was nothing attached to them.

> ***Id.***

Husband's counsel pressed Wife further:

> **Counsel**: Now you indicated in your counter-petition that [Husband] described these documents as estate planning documents?

> **Wife**: I don't know what estate documents even mean.

> **Counsel**: Okay, well that's what you indicated in your counter-petition, so I'm asking you, what did you mean by that when you filed your counter-petition?

> **Wife**: I didn't, my lawyer filed it, so I don't know. […] I mean not to sound dumb here, I don't know what estate documents even are, like I don't know.

*Id.* at 39-40.

Husband also relies on the testimony of Mr. Jones, who was at the parties' home on the day the parties executed the settlement agreement. Mr. Jones testified Wife "took the papers that she had and threw them on the table and said here, you wanted it, you got it, and then she stormed out." *See* N.T. (Day 2) at 7.

We understand Husband's contentions, and we also recognize that it was Wife's burden, not Husband's, to show she did not have an opportunity to consult an attorney. Moreover, we have held that the opportunity to consult an attorney may occur long before a proposed agreement is ever reduced to writing. *See Simeone v. Simeone*, 551 A.2d 219, 225 (Pa. Super. 1988), *affirmed* 581 A.2d 162 (Pa. 1990) (holding that the duress claimant had an opportunity to consult counsel, despite no draft being presented until the eve of the wedding, because witness testimony revealed that parties previously discussed a potential prenuptial agreement).[4]

Whether Wife had the opportunity to seek counsel turns on the credibility of the witnesses. The trial court did not weigh heavily Mr. Jones' testimony that Wife threw down a stack of papers on the counter. Mr. Jones did not testify that the stack of papers included the settlement agreement; this was an inference Husband wanted the trial court to make, and one that is

---

[4] We clarify that this citation to *Simeone* refers to the Superior Court's decision prior to the Supreme Court's *Simeone* decision, which we discussed above.

- 25 -

largely irrelevant to the question of whether Wife signed the agreement under duress. Instead, the court found Wife maintained throughout her testimony that, while Husband often threatened divorce as a punishment, he told Wife the settlement agreement he gave her to sign in January 2017 was merely a paper trail he needed for his employment. *See* N.T. (Day 1) at 34, 16. In fact, Husband told Wife explicitly he was not divorcing her, but that he needed an agreement saying they were separated. *Id.* at 49-50. Husband promised Wife he loved her and he "wouldn't do you dirty." *Id.* at 16.

Because Wife did not consider the settlement agreement to be incident to a divorce, it follows that the "divorce papers" she received in August 2016 were truly different in nature from the settlement agreement presented to her on January 13, 2017 (notwithstanding her unfamiliarly with her lawyer's "estate planning" terminology). This inference is supported by Wife's cross-examination testimony that she never negotiated the division of property with Husband prior to the settlement agreement, a document Husband promised had nothing to do with a potential divorce. *Id.* at 36-37. Instantly, what Husband seeks is for this Court to "usurp the trial court's fact-finding function" and reweigh the testimony, per our discussion above. *See Stackhouse*, *supra.*

In sum, we conclude the record supports the trial court's determination that Wife did not have the ability to consult with an attorney. When coupled with our analysis above regarding Wife's inability to overcome the degree of restraint and danger, we ultimately conclude Wife met the legal definition of

duress. As such, the settlement agreement lacked mutual assent, rendering it voidable. The court did not err when it granted Wife's request to invalidate the settlement agreement. By virtue of our disposition of Husband's first appellate issue, we need not address Husband's second issue, whether Wife established the alternative ground of fraud.

We turn to Husband's final appellate issue, whether the court demonstrated an appearance of bias. Husband presents a myriad of examples of judicial impropriety. *See* Husband's Brief at 47-52. Most are regurgitations of Husband's previous arguments concerning the court's credibility determinations. ***See id.*** at 49-51. By now we have addressed the credibility issue thoroughly, but we observe that an adverse ruling does not establish bias on the part of the judge. ***See Commonwealth v. McCauley***, 199 A.3d 947, 951 (Pa. Super. 2018) (citing ***Commonwealth v. Travaglia***, 661 A.2d 352, 367 (Pa. 1995)).

In three other instances of the trial court's alleged bias, we must find waiver pursuant to Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). We briefly summarize them as follows.

First, Husband takes aim at the trial court's first opinion (T.C.O.1, at 1-45), which the court issued contemporaneously with its order. In this opinion, the court stated it took judicial notice of the prior proceedings and then detailed the parties' elaborate procedural history. Husband's specific contention, however, is not that the court took judicial notice of the record.

His contention is the court had an implicit bias in the instant matter after having previously adjudicated the parties' prior cases, including the July 2018 PFA hearing, where the court made the rather remarkable credibility determination that Husband "was playing the system like a Stradivarius." **See C.H.L. v. W.D.L.**, 214 A.3d 1272, 1275 (Pa. Super. 2019). The issue is waived, because Husband did not seek the court's recusal prior to or even during the instant hearing.[5]

Second, Husband cites the portion of testimony where the court reprimanded him. **See** Husband's Brief at 48-49. At one point during the testimony, the court discovered Husband was texting with his sequestered witness. **See** N.T. (Day 1) at 45-47. The court instructed Husband's counsel to review the texts and, without divulging what the texts said, represent with appropriate candor whether Husband violated the court's sequestration order. Counsel conceded the witness texted Husband, but only because the witness had to leave soon to retrieve his daughter from school. The court was satisfied by counsel's explanation that the text was purely logistical and allowed the testimony to continue. If Husband detected impropriety with the court's demeanor, he was obligated to raise the matter immediately.

---

[5] We do not suggest that this trial court, or any court that presides over multiple family court cases, should automatically recuse when confronted with its prior credibility determinations. On this issue, we "recognize that our trial judges are honorable, fair and competent" and that "the judge himself [or herself] is best qualified to gauge his [or her] ability to preside impartially." **In re A.D.**, 93 A.3d 888, 893 (Pa. Super. 2014).

Finally, Husband contends the trial court conducted an improper factual investigation when it independently researched the person who notarized Husband's signature of the settlement agreement, and thus the court improperly considered facts not offered in reaching its decision. Only this allegation of impropriety is worthy of discussion.

We review challenges to a court's partiality for an abuse of discretion. **McCauley**, 199 A.3d at 950.

> [T]he appearance of bias or prejudice can be as damaging to public confidence in the administration of justice as the actual presence of bias or prejudice. However, simply because a judge rules against a [party] does not establish bias on the part of the judge against that [party]. Along the same lines, a judge's remark made during a hearing in exasperation at a party may be characterized as intemperate, but that remark alone does not establish bias or partiality.

**Id.** at 950-951 (citations and quotations omitted).

In practice, "[d]iscretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." **Commonwealth v. Goldman** 70 A.3d 874, 879 (Pa. Super. 2013) (quoting **Commonwealth v. Widmer**, 744 A.2d 745, 753 (Pa. 2000)).

In its opinion accompanying its order, the court noted:

> Husband's signature was notarized on the same day as Wife's, January 13, 2017, by a Jennifer Berger, stamped in Stroud Township. [The court] also note[s] that there is a

> Jennifer Berger, who is a notary public, working as a paralegal in the office of Kash Fedrigon Belanger, LLC. Furthermore, the office of Kash Fedrigon Belanger, LLC. is located in Stroud Township and represented Husband at the time of the [settlement agreement's] execution.

T.C.O. 1 at 31.

Husband avers none of this information was contained in the notes of testimony, and thus the court impermissibly based its decision on facts and evidence not of record. While we agree with Husband that the court's inquiry into Jennifer Berger's employment was an error of judgment, we do not conclude it was so manifestly unreasonable that it rises to the level of an abuse of discretion.

Critically, the court's inquiry into Jennifer Berger had no bearing on the court's findings. We know this because it was never a mystery where, and by whom, Husband had his signature notarized. Both parties testified Husband took the settlement agreement to his attorney's office. The only dispute was **when** Husband had his signature notarized. Wife testified that after she had her signature notarized, the parties immediately drove to Husband's attorney's office to get his signature notarized. Husband testified that he took the settlement agreement to his attorney on the following Monday, January 16, 2017. **See** N.T. (Day 2) at 28. To resolve this discrepancy, the court consulted the settlement agreement. Wife's signature was stamped by Mr. Garvey. Husband's signature was stamped by Jennifer Berger. Both notarizations are separately dated January 13, 2017.

Husband's argument does not end here. Husband's Brief also suggests the court should not have even consulted the notarization stamps in the settlement agreement, because the settlement agreement was not formally admitted into evidence. *See* Husband's Brief at 48. Although Husband marked the settlement agreement as *his* Exhibit 2, discussed it in detail on the witness stand, and used it to cross-examine Wife, Husband apparently forgot to seek its admission into evidence. *See* N.T. (Day 1) at 45, 47-48, 55. In fact, Husband forgot to seek admission of all his exhibits. Unlike those exhibits, the settlement agreement also exists in the record, because Husband attached it to his petition for contempt and enforcement. Only on appeal does Husband shy away from this document.

We find this situation to be akin to the conundrum presented in *Green v. Green*, 69 A.3d 282 (Pa. Super. 2013). In *Green*, divorcing parties appeared for an equitable distribution trial. But at trial, the parties reached a partial agreement. And although the trial never actually took place, they reduced this partial agreement to a document that they labeled as "Exhibit 1." Years later, the trial court considered "Exhibit 1" to adjudicate outstanding property issues. Unhappy with the court's decision, the husband appealed.

On appeal, the appellant argued that the trial court's consideration of "Exhibit 1" was erroneous, because "Exhibit 1" was never formally admitted into evidence. *Green*, 69 A.3d at 283-285. In our review, we observed it should have been clear to the appellant that the trial court intended to use "Exhibit 1" as record evidence; we noted further that the appellee's underlying

motion referenced "Exhibit 1;" and we recognized that the appellant never objected to the court's use of "Exhibit 1" at trial. ***Id.*** at 286-287. Ultimately, we concluded the husband waived the issue for failing to raise it in the lower court, pursuant to Pa.R.A.P. 302(a). ***Id***.

Returning to the instant matter, Husband was the party who sought the enforcement of the settlement agreement. He was the party who entered it into the record. And at trial, he utilized it on both direct and cross examination, because he was the party seeking to uphold its validity. After the trial court explained its decision, Husband's failure to seek formal admission of the settlement agreement became fortuitous, because the notarization page impeached his testimony. Only on appeal does Husband argue the trial court could not consider it. We disagree and conclude that, like in ***Green***, Husband cannot object to the court's reliance on a document he sought to uphold for the first time on appeal. As such, we conclude Husband has largely waived his third appellate issue. To the extent that he has not, the trial court did not display an appearance of impropriety.

In sum, we conclude the trial court did not commit an abuse of discretion, nor an error of law, when invalidating the parties' settlement agreement on grounds of duress. Given this decision, we need not address Husband's challenge to the trial court's finding of fraud. We further conclude that Husband's allegations of trial court impropriety are waived or merit no relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/12/2020</u>