J-S42002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JENNIFER ORSINI | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALFRED ORSINI | : | |
| | : | |
| Appellant | : | No. 791 WDA 2022 |

Appeal from the Order Entered June 28, 2022
In the Court of Common Pleas of Fayette County Civil Division at No(s):
No. 3323 of 2019, G.D.

BEFORE:   BOWES, J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY BOWES, J.:                **FILED: FEBRUARY 28, 2023**

Alfred Orsini ("Husband") appeals from the final divorce decree related to Jennifer Orsini ("Wife").  We affirm.

Husband and Wife were married on August 21, 2004.  The day prior, the parties entered into a prenuptial agreement wherein Wife relinquished her rights to, *inter alia*, alimony and all of Husband's assets, including property acquired during the marriage.  In 2019, Wife initiated the underlying matter by filing a complaint for divorce.  As part of the divorce proceedings, Wife filed a motion to set aside the prenuptial agreement.  According to Wife, the parties did not discuss prenuptial agreements during their engagement and her signature on the agreement was obtained by fraud, misrepresentation,

---

[*] Retired Senior Judge assigned to the Superior Court.

duress, and undue influence. *See* Motion to Set Aside Prenuptial Agreement, 1/15/20, at unnumbered 2.

The court held a hearing on the motion. Wife testified on her own behalf. Husband testified and presented testimony from Kim Brundage, his ex-fiancé and Wife's friend, as well as his sister, Coleen Orsini Pongoriero. Much of the testimony surrounded Wife's affair during their lengthy engagement and Husband's decision to seek a prenuptial agreement as a result. There were disputes regarding when Wife learned about the prenuptial agreement, but both parties testified that Wife first saw the actual agreement the day before the wedding. After taking the matter under advisement, the court granted Wife's motion to set aside the prenuptial agreement, finding that she "was not afforded **any** opportunity to seek the advice of counsel" because she first saw the agreement the day before the wedding. Order, 2/1/22 (emphasis in original). The court also "credit[ed] Wife's testimony that she was not advised to seek counsel by counsel for Husband or by Husband and the agreement itself prepared by counsel for Husband makes no reference to Wife waiving counsel or being afforded the opportunity to seek her own counsel." *Id*. at n.1 (capitalization altered).

Thereafter, the parties proceeded to an equitable distribution hearing before a court-appointed master. The master produced a report and recommendation regarding the division of marital property. Husband filed exceptions to the master's report, which were denied. On June 29, 2022, a final divorce decree was entered. This timely filed appeal followed. Both

Husband and the trial court have complied with Pa.R.A.P. 1925. Husband

raises the following issues for our consideration:

I. Whether the Honorable trial court factually and legally erred and abused its discretion in finding that the prenuptial agreement, dated August 20, 2004, was invalid based on "duress" by clear and convincing evidence for each and every of the following reasons:

a. [Wife] failed to sustain her heavy burden of proof to establish duress in that she offered not a breath of testimony that [Husband] engaged in a systematic pattern of emotional, mental, and physical abuse perpetuated against her prior to, up to, or during the signing of the prenuptial agreement.

b. [Wife] failed to sustain her heavy burden of proof to establish duress in that she failed to offer any testimony that [Husband] engaged in a web of domestic violence, control, manipulation, and intimidation against her prior to, up to, or during the signing of the prenuptial agreement.

c. [Wife] failed to sustain her heavy burden of proof to establish duress in that she failed to offer testimony that she was under any mental defect prior to, up to, or during the signing of the prenuptial agreement that rendered her incapable of understanding the terms and conditions of the prenuptial agreement.

d. [Wife] failed to sustain her heavy burden of proof to establish duress in that she failed to offer testimony evidencing [Husband] manipulated her prior to, up to or during the signing of the prenuptial agreement.

e. [Wife] failed to sustain her heavy burden of proof to establish duress in that she failed to offer any testimony that there existed any degree of restraint or danger, either inflicted or threatened

and impending on the part of [Husband], which was sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness such as herself.

f. [Wife] failed to sustain her heavy burden of proof to establish duress in that she offered no testimony that she was uncomfortable signing the prenuptial agreement without consulting an independent attorney of her choosing, despite the agreement being signed on the eve of the parties' wedding. [Wife[1]] also failed to offer testimony that she was not given the opportunity to obtain independent legal counsel prior to signing the prenuptial agreement.

g. [Wife]'s testimony was not credible nor believable on the issue of duress and was contradictory to witness testimony. [Wife] testified that she felt pressured to sign the prenuptial agreement.

h. The special divorce master erred in her report and recommendation by not considering the terms of the prenuptial agreement entered into by the parties.

Husband's brief at 6-7 (capitalization altered).

Although framed as several separate issues, Husband raises a single issue in the argument section of his brief. Specifically, Husband claims that Wife failed to meet her burden of proof to establish duress and the court therefore erred in setting aside the prenuptial agreement and preventing the special master from distributing the marital estate in accordance with the

_____

[1] In his statement of questions, Husband referred to himself at this juncture. *See* Husband's brief at 7 ("**The Appellant** also failed to offer testimony that she was not given the opportunity to obtain independent legal counsel prior to signing the prenuptial agreement." (emphasis added)). We have corrected this apparent error within this memorandum.

- 4 -

prenuptial agreement. *See* Husband's brief at 27. We consider this issue pursuant to the following legal framework.

Prenuptial agreements are contracts and are therefore governed by contract principles. *See Stackhouse v. Zaretsky*, 900 A.2d 383, 386 (Pa.Super. 2006). "In determining whether the trial court properly applied contract principles, the reviewing court must decide, based on all the evidence, whether the trial court committed an error of law or abuse of discretion." *Lewis v. Lewis*, 234 A.3d 706, 711 (Pa.Super. 2020) (cleaned up). "An abuse of discretion is not lightly found, as it requires clear and convincing evidence that the trial court misapplied the law or failed to follow proper legal procedures." *Stackhouse*, *supra* at 386 (cleaned up). In conducting this review, "we will not usurp the trial court's fact-finding function." *Lewis*, *supra* at 711 (cleaned up). For any questions of law, however, our standard of review is *de novo* and our scope plenary. *Id*.

In the case *sub judice*, Wife and Husband had differing accounts surrounding Wife's knowledge of the prenuptial agreement before it was signed. Wife testified that the parties had never discussed a prenuptial agreement until the day before their wedding. *See* N.T., 1/14/21, at 17. To wit, in the afternoon on the day before the wedding, Husband showed up at Wife's home, unannounced, and told her that they were going for a ride. *Id*. at 21. When she twice asked where they were going, he responded that she would see when they got there. *Id*. at 21-22. Eventually, during the car ride, Husband told her that they were going to an attorney's office to sign a

- 5 -

prenuptial agreement. *Id*. at 22. When they arrived, Wife was taken to a conference room that already had papers set on the table. *Id*. After Husband's attorney had her sit down, he "flipped through the pages and read [Husband's] property off and then he read hers and he said, 'here, sign.'" *Id*. at 23. We note that Husband had listed twenty-seven items of property belonging to him, including real estate, vehicles, firearms, financial accounts, furniture, and electronics, whereas Wife's property consisted of only two items: her home and her vehicle.

Wife further testified that Husband's attorney did not inquire whether she had previously spoken with an attorney or suggest that she should. *Id*. According to Wife, Husband's attorney appeared to be under the impression that Wife was privy to the agreement. *Id*. Wife testified that she signed the agreement after Husband signed. *Id*. at 26. She stated that she was confused, caught off guard, very upset, did not say much, and was crying because she felt "betrayed" and "a little bit hijacked[.]" *Id*. at 22-23. After the agreement was signed, Husband paid his attorney and drove Wife home in silence. *Id*. at 28-29. She elucidated that she had been in shock at the time and felt pressured to sign the prenuptial agreement because the wedding was the next morning and everything was already planned. *Id*. at 28-29.

Husband, on the other hand, testified that as a result of Wife's affair during their engagement, he told her a few weeks before the wedding that he would only marry her if she signed a prenuptial agreement. *Id*. at 59-60. He claimed that Wife provided the information for the two items appended to the

agreement that were designated as hers, and that she knew beforehand that they were going to the attorney's office to sign the agreement. *Id*. at 61-63. He agreed, however, that Wife did not see the prenuptial agreement itself until the day before the wedding. *Id*. at 70.

In granting the motion to set aside the prenuptial agreement, the trial court found Wife's testimony credible. Much of Husband's argument on appeal challenges this credibility determination, arguing that the court "failed to conduct a thorough examination of the party's testimony which would have exposed to the light of reality no basis for invalidating the prenuptial agreement on the basis of 'duress.'" Husband's brief at 27; *see also id*. at 21-24 (arguing that Husband's testimony was corroborated by other witnesses while Wife's was not). According to Husband, "[e]ven if one gives the slightest degree of credit to [Wife]'s testimony that the prenuptial agreement was signed on the eve of the wedding there was nothing to have prevented her from signing it, consulting an attorney or simply calling off the wedding. No restraints, no threats and certainly no abuse (past or present) perpetuated [*sic*] by [Husband]." Husband's brief at 26-27.

Insofar as Husband asks this Court to reweigh the evidence, that is outside the purview of this Court. *See Lewis*, *supra* at 713 ("The problem with [appellant's] argument is that he mistakenly believes it is our role to reweigh evidence."). The trial court heard the testimony offered by Husband and Wife, as well as the parties' attempts at impeachment and corroboration, and believed Wife based on the testimony offered and the text of the

prenuptial agreement. As this Court has explained, it fell to the trial court to determine the facts by assessing the credibility of multiple witnesses, a task that not only this Court "does not relish" but, "without having the benefit of observing the parties firsthand, one we cannot perform." *Id*. at 714.

Upon review, we cannot say that the court's decision to credit Wife's testimony was so unreasonable as to amount to an abuse of discretion. Therefore, we will not overturn the court's credibility determinations but are, instead, bound by them. Our inquiry does not end here, however, as Husband also challenges the trial court's deduction from its factual findings that Wife proved "duress to the degree that necessitated the setting aside of the prenuptial agreement." Husband's brief at 20. This question is squarely within our purview: "Whether the facts found by the trial court constitute duress as a matter of law is a purely legal question for which our scope of review is plenary, and our standard of review is *de novo*." *Lewis*, *supra* at 715 (cleaned up).

We begin with an overview of the relevant legal principles. "Absent fraud, misrepresentation, or duress, parties are generally bound by the terms of their agreements. Mutual assent is necessary to enter into a contract; mutual assent does not exist however, when one of the contracting parties elicits the assent of the other contracting party by means of duress." *Lewis*, *supra* at 714 (cleaned up). Duress has been defined as "that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a

person of ordinary firmness." ***Id***. at 715 (cleaned up). "A party who has reasonable opportunity to consult with counsel before entering a contract cannot later invalidate it by claiming duress." ***Adams v. Adams***, 848 A.2d 991, 994 (Pa.Super. 2004).

"Because settlement agreements are presumed valid and binding, the party seeking to avoid or nullify the agreement has the burden of proving the invalidity of the agreement by clear and convincing evidence." ***Lewis***, ***supra*** at 714 (cleaned up). This Court has emphasized the heavy burden a movant bears in this context thusly:

> In our review of the relevant Pennsylvania case law, no spouse has ever convinced a court to void a settlement agreement on grounds of duress. There have been many instances where the party claiming duress suffered unseemly pressures to sign an agreement, but in each case, the courts concluded that those pressures did not constitute duress in the legal sense. For instance, in ***Simeone v. Simeone***, 581 A.2d 162 (Pa. 1990), the claimant alleged she was forced to sign a prenuptial agreement on the eve of her wedding, "a time when she could not seek counsel without the trauma, expense, and embarrassment of postponing the wedding." ***Id.***, 581 A.2d at 167. Likewise, in ***Hamilton v. Hamilton***, 591 A.2d 720, 722 (Pa.Super. 1991), the claimant alleged she was told that without a prenuptial agreement, there would be no wedding, notwithstanding the fact that "she was pregnant, unemployed, and probably frightened." In ***Lugg v. Lugg***, 64 A.3d 1109, 1113-1114 (Pa.Super. 2013), we concluded that "[d]aily badgering and one and one-half hours of 'pressure and negotiations' does not rise to the level of coercion necessary to find duress."

***Lewis***, ***supra*** at 715 (cleaned up); ***see also Adams***, ***supra*** at 993 ("[T]he mere fact appellant was faced with stress and anxiety resulting from her divorce proceedings does not establish duress in the legal sense.").

Notwithstanding this heavy burden, this Court found duress in **Lewis** based on, *inter alia*, threats of bodily harm and a history of varying forms of abuse.

In his brief to this Court, Husband distinguishes **Lewis**'s finding of duress because the "systematic pattern of physical and mental abuse/manipulation" present in **Lewis** "was non-existent under the facts of the instant case." Husband's brief at 27. Rather, Husband contends that the circumstances of the case *sub judice* are more akin to **Simeone**, **Hamilton**, and **Lugg**, where no duress was found.

It is uncontroverted that the evidence adduced did not establish any abuse surrounding the signing of the prenuptial agreement. We do not, however, read the foregoing cases as establishing a rule that duress will **only** be found where there is a systematic pattern of abuse in place at the time of signing the challenged agreement. Critically, the **Lewis** Court held that even if the appellant's actions did not amount to a threat of actual bodily harm, we would still have concluded that the claimant established the legal definition of duress "because [she] did not have the opportunity to consult with counsel." **Lewis**, **supra** at 719.

> In our case law, the duress claimant's ability to consult with an attorney has often proved to be fatal to the claim. No matter how reprehensible the negotiation tactics were, if the claimant was able to consult with an attorney, the danger or restraint could not have been sufficiently severe to constitute legal duress.

***Id***.

For example, in **Simeone**, the claimant contended "that the agreement was executed under conditions of duress in that it was presented to her at 5

p.m. on the eve of her wedding, a time when she could not seek counsel without the trauma, expense, and embarrassment of postponing the wedding." *Simeone*, *supra* at 167. The master and reviewing courts found this claim not to be credible because they gave credence to the testimony of other witnesses that, although the claimant did not see the final version of the agreement until the eve of the wedding, the parties "engaged in several discussions . . . regarding the contents of the agreement during the six month period preceding that date." *Id*. Additionally, "legal counsel who prepared the agreement for appellee testified that, prior to the eve of the wedding, changes were made in the agreement to increase the sums payable to [the claimant] in the event of separation or divorce." *Id*. Finally, our Supreme Court "noted, too, that during the months when the agreement was being discussed [the claimant] had more than sufficient time to consult with independent legal counsel if she had so desired." *Id*.

In *Hamilton*, the claimant was told "that without the agreement there would be no wedding" and, at the time, "she was pregnant, unemployed, and probably frightened." *Hamilton*, *supra*, at 722. However, this Court emphasized that "she was represented by counsel, who was available to advise and did, in fact, advise her not to sign the agreement." *Id*. That she chose to ignore this advice and sign the agreement anyway evinced that she did not sign under duress. *See id*.

In *Lugg*, the claimant argued that the post-nuptial agreement should be set aside because she signed it under duress. According to claimant, she

was pressured daily to sign the agreement and there was a conspiracy to get her to sign the agreement without her counsel being able to first review it. *See Lugg*, *supra* at 1113. This Court rejected the claim of duress, finding that the record belied her averments as she, in fact, contacted her attorney. Moreover, in scheduling a meeting to sign the agreement, the claimant's husband included a note that contemplated the claimant showing the proposed agreement to her attorney. *See id*. at 1114. Accordingly, this Court found that there was no duress.

Finally, in concluding that the appellant in *Adams* had failed to prove duress, we highlighted the fact that "[t]he parties engaged in extensive negotiations regarding the terms of the agreement" and the claimant "consulted with her counsel on multiple occasions prior to entering the agreement." *Adams*, *supra* at 994.

This Court concluded in *Lewis* that the claimant did not have the ability to consult with an attorney. "When coupled with our analysis . . . regarding [the claimant's] inability to overcome the degree of restraint and danger, we ultimately conclude[d the claimant] met the legal definition of duress. As such, the settlement agreement lacked mutual assent, rendering it voidable." *Lewis*, *supra* at 721.

At first glance, the matter *sub judice* may seem more akin to *Simeone* or *Hamilton* and not *Lewis* because of the underlying wedding pressures and lack of abuse. However, we find one dispositive difference between this case and *Simeone* and *Hamilton*: the lack of an opportunity to consult with an

- 12 -

attorney. It was on this absence of opportunity that the trial court based its finding of duress:

> The agreement consists of seven paragraphs, none of which states that Wife had an opportunity to review the agreement with counsel nor is there a provision where the parties acknowledge and affirm that each has made a true, correct, and complete representation of their financial status and all of the debts and/or obligations for which he or she presently is responsible. We note that the attachments to the agreement list approximately twenty-seven items for [Husband] and only a house and car for [Wife]. Not only do we find this is not a full and fair disclosure, it was clear to the court that this supported the claim of [Wife] that she was blindsided by the prenuptial agreement the day before the wedding. The fact that neither a checking account or clothing, furniture, or any other personal items are listed lends a great deal of credibility to [Wife]'s claims and violate the full and fair disclosure requirement consistent with traditional principles of contract law.

Trial Court Opinion, 8/26/22, at 6-7 (cleaned up).

The appellate courts did not reject the claims of duress in **Simeone** and **Hamilton** because pressures attendant to weddings are *per se* insufficient to establish duress. As discussed, our courts rejected those claims of duress because the facts, as found by the finder of fact, established that the claimant either had months to consult an attorney or in fact did consult an attorney. As in **Lewis**, "[w]hether Wife had the opportunity to seek counsel turns on the credibility of the witnesses." **Lewis**, *supra* at 720.

Instantly, the trial court credited Wife's testimony that she was unaware that Husband wanted a prenuptial agreement until she was brought to the office of Husband's attorney the day before her scheduled wedding and presented with the agreement and a pen to sign it. While Husband focuses

on his proffered evidence that he had discussed a prenuptial agreement in the abstract with Wife a few weeks before the wedding, the trial court found that testimony not credible. Instead, it credited Wife's testimony that she had been caught wholly unaware by the agreement. She further testified that she was in shock, confused, and felt pressured to sign the agreement so that Husband would not cancel their planned wedding. *See* N.T., 1/14/21, at 28 ("[M]y wedding was the next morning. Everything was already done. I didn't want to start some huge argument and have him cancel everything and throw it all away."). Critically, Husband's attorney did not ask her whether she had spoken with an attorney nor provided the opportunity for her to do so.

Based on the trial court's credibility determinations, by which we are bound, Wife did not see the prenuptial agreement until less than twenty-four hours before her scheduled wedding. Since Wife did not know beforehand that a prenuptial agreement was even being contemplated, she did not have the opportunity to contact an attorney or negotiate the terms in any meaningful way before seeing the finalized prenuptial agreement. In short, Husband obtained Wife's assent by way of an ultimatum "sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness." *Lewis*, *supra* at 715 (cleaned up).

Based on the foregoing, the trial court did not err in concluding that Wife signed the prenuptial agreement under duress and granting her motion to set it aside. Accordingly, Husband was not wrongfully deprived of the benefit of

the agreement in the master's recommended distribution of the marital estate.

Thus, we affirm the order of the trial court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/28/2023